Troy DeWayne HUGHES, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2000–SC–0156–MR.

Supreme Court of Kentucky.

Aug. 22, 2002.

V. Gene Lewter, Fayette Co. Legal Aid, Inc., Lexington, Counsel for Appellant.

A.B. Chandler, III, Attorney General, Susan Roncarti, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

COOPER, Justice.

On January 3, 1999, officers of the Lexington–Fayette Division of Police discovered the dead body of Keisha Hughes in apartment 405, 325 Bainbridge, Lexington, Kentucky, a residence she shared with her husband, Appellant Troy DeWayne Hughes, and her two children by a previous relationship. Appellant later confessed to killing his wife by strangulation. He entered a conditional guilty plea, RCr 8.09, to murder and was sentenced to forty years in prison. On appeal, he asserts that (1) evidence of the discovery of the victim's body should have been suppressed because it was discovered during the course of a warrantless search; (2) his confession should have been suppressed because the person who advised him of his *Miranda* rights was not the same person who conducted the interrogation; and (3) the "violent offender statute," KRS 439.3401, is unconstitutional because it provides an earlier minimum parole eligibility date for a life sentence than for a term of forty years.

## I. WARRANTLESS SEARCH.

At 8:50 a.m. on January 3, 1999, Ella Woodward, the mother of Keisha Hughes, reported to the Lexington–Fayette Division of Police that her daughter had not been seen for two days and had failed to pick up her children whom she had left with relatives in Louisville. She further advised that her daughter was married to Troy Hughes, that they lived at apartment 405, 325 Bainbridge, and that they had experienced marital problems in the past. Officer Varney was dispatched to 325 Bainbridge. Appellant answered the door at apartment 405 and advised Varney that his wife was inside the apartment, asleep, and did not wish to be disturbed. This information was relayed to Mrs. Woodward who expressed dissatisfaction with Appellant's explanation. At approximately 11:30 a.m. that same day, another officer, Darnell Dials, proceeded to 325 Bainbridge and obtained no response to repeated knocks on the door of apartment 405. Dials detected a foul odor emanating from the apartment and initially thought the source might be soiled baby diapers. Because he "wanted to make sure everything was OK inside the apartment," Dials asked the apartment manager to unlock the door so that he could enter the apartment. He also asked the manager if there were any babies in diapers living in the apartment, and she responded that there were none. Upon opening the apartment door, Dials encountered a rush of extremely hot air permeated with the same foul odor he had previously detected from outside the apartment. He then suspected that the odor might be caused by decomposing human remains. He found Keisha Hughes's dead body in the back

bedroom. Dials immediately left the apartment, locked it, and did not further search it or remove any evidence from it until after he had obtained a search warrant.

Appellant asserts that the discovery of the victim's body should have been suppressed because Dials illegally entered the apartment without a search warrant. Following a suppression hearing, RCr 9.78, the trial judge found that Dials had entered the apartment because he reasonably believed that Keisha Hughes might be in need of immediate assistance. That is an exigent circumstance authorizing a warrantless search.

> We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.

*Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978). *See Mills v. Commonwealth,* Ky., 996 S.W.2d 473, 480 (1999), *cert. denied,* 528 U.S. 1164, 120 S.Ct. 1182, 145 L.Ed.2d 1088 (2000); *Todd v. Commonwealth,* Ky., 716 S.W.2d 242, 247–48 (1986); *Gillum v. Commonwealth,* Ky.App., 925 S.W.2d 189, 190 (1995). In *Gillum,* a neighbor reported to the police that he had not seen Gillum for some time; that the door to Gillum's truck had stood open from 8:00 p.m. until 2:00 a.m.; that lights had been left on in Gillum's residence; that the neighbor had repeatedly knocked on doors and windows to no avail and had attempted unsuccessfully to contact Gillum by telephone; and that Gillum lived alone and had a history of heart problems. These facts were deemed sufficient to justify a warrantless entry by the police who discovered, in plain view, a large number of marijuana plants that Gillum was cultivating on the premises. *Id.* at 191

■ The "clearly erroneous" standard of review applies to a trial court's findings on a motion to suppress evidence obtained during a search. "If supported by substantial evidence the factual findings of the trial court shall be conclusive." RCr 9.78. Dials had information that the victim had been reported missing for two days and that she had failed to pick up her children after leaving them with relatives in Louisville; that she and Appellant had experienced marital problems; that Appellant had refused Officer Varney's earlier request to see the victim on the excuse that she was asleep; and that when Dials returned to the apartment, no one answered his knock on the door and an unusual odor was emanating from inside the apartment. This was substantial evidence supporting the trial judge's finding that Dials had a reasonable belief that Keisha Hughes might be inside the apartment and in need of emergency assistance. We reject Appellant's disingenuous argument that Dials should have known when he smelled the odor of decomposing human remains that the victim was no longer in need of assistance.

■ There is another reason why the motion to suppress the evidence of the discovery of the victim's body could have been properly overruled. The victim's brother, Leslie Woodward, testified that he arrived at 325 Bainbridge while Dials was inside the apartment and that he would have entered the apartment, himself, if Dials had not already done so. Even if that were not so, the victim's body inevitably would have been discovered, especially as the odor of decomposition in-

creased.[1]

In *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the United States Supreme Court adopted the "inevitable discovery rule" to permit admission of evidence unlawfully obtained upon proof by a preponderance of the evidence that the same evidence would have been inevitably discovered by lawful means. *Id.* at 444, 104 S.Ct. at 2509. Noting that the rationale behind excluding the "fruit of the poisonous tree," *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), was that the prosecution should not be put in a better position than it would have been if the illegality had not transpired, the Court concluded in *Nix* that, conversely, the prosecution should not be put in a worse position than if no police error or misconduct had occurred. *Nix, supra,* at 443, 104 S.Ct. at 2508–09. In *Nix,* the victim's body was initially discovered as a result of an unlawfully obtained statement from the defendant; however, the body was found within an area already being searched by two hundred volunteers who inevitably would have discovered it "in short order." *Id.* at 435–37, 104 S.Ct. at 2504–06. The doctrine has been applied to the fruits of illegal searches as well as to the fruits of illegally obtained confessions. *E.g., United States v. Scott,* 270 F.3d 30, 42 (1st Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1583, 152 L.Ed.2d 501 (2002); *United States v. Kimes,* 246 F.3d 800, 803–04 (6th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 823, 151 L.Ed.2d 705 (2002); *United States v. Ford,* 184 F.3d 566, 577 (6th Cir.1999), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000). We reject the suggestion that if Dials had not discovered the victim's body when he did, Appellant might have been able to remove

and conceal it. Suffice it to say that there is no " 'constitutional right' to destroy evidence." *Segura v. United States,* 468 U.S. 796, 816, 104 S.Ct. 3380, 3391, 82 L.Ed.2d 599 (1984) (applying the conceptually similar "independent source rule").

## II. CONFESSION.

 Appellant was arrested by Officer Ricky Lynn at 1:50 p.m. on January 3, 1999, after a brief automobile and foot chase. Lynn immediately advised Appellant of his constitutional rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Appellant acknowledged that he understood those rights. Lynn then advised Appellant that he would be questioned, not by Lynn, but by a homicide detective. Lynn transported Appellant to police headquarters where he (Lynn) advised Detective David Lyons that Appellant had been advised of his rights and had stated that he understood those rights. Detective Lyons began his interrogation of Appellant at 3:00 p.m. that same day without readvising Appellant of his rights. Appellant did not testify at the suppression hearing and does not claim that Officer Lynn did not advise him of his *Miranda* rights or that he did not understand those rights. (Appellant has three prior felony convictions.) He argues for a bright line rule that *Miranda* warnings must be repeated whenever there is a delay between the warning and the interrogation or whenever the warning is given by someone other than the interrogator.

Appellant acknowledges that there is no authority supporting this proposition, and none is found. There is, however, ample authority to the contrary. Specifically, it was held in *United States v. Andaverde,* 64 F.3d 1305, 1313 (9th Cir.1995), *cert. denied,* 516 U.S. 1164, 116 S.Ct. 1055, 134

---

1. Contrary to the complaint registered by the concurrence, *post,* we are not here making a "finding of fact," but only recognizing the existence of an indisputable fact.

L.Ed.2d 199 (1996), that there is no per se rule that a suspect must be readvised of his *Miranda* rights after the passage of time or a change in questioners. *See also United States v. Boyd*, 180 F.3d 967, 977 (8th Cir.1999) (no requirement to readvise of *Miranda* rights merely because of 1½ hour delay between advisement and interrogation); *United States v. Baron*, 94 F.3d 1312, 1320 (9th Cir.1996) (no requirement to readvise merely because the officer who advised was a state police officer and the interrogator was a federal agent), *cert. denied*, 519 U.S. 1047, 117 S.Ct. 624, 136 L.Ed.2d 546 (1996); *United States v. Frankson*, 83 F.3d 79, 83 (4th Cir.1996) (2½ hour delay did not require readvisement); *United States v. Diaz*, 814 F.2d 454, 461 n. 6 (7th Cir.1987) (several hours), *cert. denied*, 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987); *Jarrell v. Balkcom*, 735 F.2d 1242, 1253 (11th Cir.1984) (three hours), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2331, 85 L.Ed.2d 848 (1985); *United States ex rel., Henne v. Fike*, 563 F.2d 809, 814 (7th Cir.1977) (nine hours), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1257, 55 L.Ed.2d 776 (1978); *United States v. Osterburg*, 423 F.2d 704 (9th Cir.1970) (one hour and fifteen minutes), *cert. denied*, 399 U.S. 914, 90 S.Ct. 2216, 26 L.Ed.2d 571 (1970). The purpose of the *Miranda* warnings is to ensure that a suspect is aware of his constitutional rights before being interrogated. Appellant was advised of his rights and does not claim that he had forgotten them or was unaware of them when he was interrogated sixty-five minutes later. Thus, his confession was not compromised by the failure to readvise him of those rights.

### III. VIOLENT OFFENDER STATUTE.

■ As amended by the 1998 General Assembly, 1998 Ky. Acts, ch. 606, § 77,

KRS 439.3401 provides in pertinent part as follows:

(1) As used in this section, "violent offender" means any person who has been convicted of or pled guilty to the commission of a capital offense, Class A felony, or Class B felony involving the death of the victim. . . .

(2) A violent offender who has been convicted of . . . a Class A felony and receives a life sentence . . . shall not be released on . . . parole until he has served at least twenty (20) years in the penitentiary. Violent offenders may have a greater minimum parole eligibility date than other offenders who receive longer sentences, including a sentence of life imprisonment.

(3) A violent offender who has been convicted of a capital offense or Class A felony with a sentence of a term of years or Class B felony who is a violent offender shall not be released on parole until he has served at least eighty-five percent (85%) of the sentence imposed.

Appellant pled guilty to murder without a plea agreement and waived jury sentencing. At the sentencing hearing, defense counsel advised the trial judge that, pursuant to KRS 439.3401(2) and (3), Appellant would have an earlier parole eligibility date if he were sentenced to life than if he were sentenced to a term of years in excess of 24.5 years, and, if the judge intended to impose a sentence in excess of 24.5 years, Appellant would request imposition of a life sentence. The trial judge sentenced Appellant to forty years in prison. Pursuant to the KRS 439.3401(3), as written, Appellant would not be eligible for parole until after serving thirty-four years of his sentence—fourteen years longer than a violent offender serving a life sentence and nine years longer than a capital

offender serving a term of life without benefit of probation or parole for twenty-five years. KRS 532.030(1).

Prior to 1998, KRS 439.3401 contained essentially the same provisions with respect to parole eligibility for violent offenders as it does now, except that subsection (2) required service of a minimum of twelve years of a life sentence before being eligible for parole and subsection (3) required service of at least fifty percent (50%) of a term of years before being eligible for parole. Thus, under the pre–1998 version of the statute, a violent offender sentenced to a term of years of more than twenty-four years had a later parole eligibility date than a violent offender serving a life sentence. Except for extending the minimum parole eligibility dates, the only relevant change made by the 1998 amendment was the addition of the last sentence in KRS 439.3401(2): "Violent offenders may have a greater minimum parole eligibility date than other offenders who receive longer sentences, including a sentence of life imprisonment."

We are not writing on a clean slate. In *Huff v. Commonwealth*, Ky., 763 S.W.2d 106 (1988), the very same constitutional issues were raised with respect to the pre–1998 version of the statute as are raised here. Noting that the classification of offenses and the length of punishment are prerogatives of the legislature, citing *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) and *Rudolph v. Corrections Cabinet*, Ky., 710 S.W.2d 235, 236 (1986), *Huff* held that the statute was not unconstitutional as written.

We do not find the minimum imposed by the legislature to be arbitrary or capricious in any way. It is the uncertainty of life itself, not a declaration of a minimum eligibility, which creates a possible disparity. For example, a life sentence imposed on a 60–year–old defendant is not the same as a life sentence imposed upon a 20–year–old defendant. 763 S.W.2d at 208. (We might add that a forty-year sentence imposed on a sixty-year-old defendant is not the same as a forty year sentence imposed upon a twenty-year-old defendant.) We have subsequently reiterated in *Land v. Commonwealth*, Ky., 986 S.W.2d 440 (1999), that "there is no constitutional right to parole, but rather parole is a matter of legislative grace or executive clemency." *Id.* at 442.

The issue was raised again in *Sanders v. Commonwealth*, Ky., 844 S.W.2d 391 (1992). *Sanders* finessed the constitutional issues decided by *Huff, supra*, and found a legislative intent in KRS 439.3401(3) that a violent offender sentenced to a term of years would be eligible for parole after serving either fifty percent (50%) of the sentence imposed, or twelve years, *whichever was less. Id.* at 394. Of course, that is not what the statute plainly and unambiguously stated, *Mullins v. Commonwealth*, Ky., 956 S.W.2d 210, 212 (1997); and the Commonwealth points out that we have subsequently held that, when engaged in statutory construction, a court must refer to the words used in enacting the statute rather than surmising what may have been intended but was not expressed. *Commonwealth v. Allen*, Ky., 980 S.W.2d 278, 280 (1998); *see also Commonwealth v. Frodge*, Ky., 962 S.W.2d 864, 866 (1998).

Nevertheless, the 1998 amendment of KRS 439.3401(3) changed only the length of the period of parole disability from fifty percent (50%) to eighty-five percent (85%) of the imposed sentence. The amendment did not address the interpretation of the statute set forth in *Sanders*. "It is a generally recognized rule of statutory construction that when a statute has been construed by a court of last resort

and the statute is substantially reenacted, the Legislature may be regarded as adopting such construction." *Commonwealth v. Trousdale,* 297 Ky. 724, 181 S.W.2d 254, 256 (1944). Further, "the failure of the legislature to change a known judicial interpretation of a statute [is] extremely persuasive evidence of the true legislative intent. There is a strong implication that the legislature agrees with a prior court interpretation when it does not amend the statute interpreted." *Rye v. Weasel,* Ky., 934 S.W.2d 257, 262 (1996).

The Commonwealth argues that a contrary legislative intent was expressed by the added language in the amendment of KRS 439.3401(2): "Violent offenders may have a greater minimum parole eligibility date than *other offenders* who receive longer sentences, including a sentence of life imprisonment." (Emphasis added.) We disagree. The reference to "other offenders" obviously refers to offenders other than "violent offenders." Parole eligibility guidelines for "other offenders" are generally established by the parole board, KRS 439.340(3), and nonviolent offenders obviously have earlier parole eligibility dates. 501 KAR 1:030 § 3. Furthermore, KRS 439.3401(2) pertains only to life sentences. Under current parole board guidelines, a nonviolent first offender serving a life sentence is eligible for parole after serving eight years. 501 KAR 1:030 § 3(a). Regardless, KRS 439.3401(3), which pertains to sentences to a term of years and which was the provision interpreted in *Sanders, supra,* was not amended to add new language similar to that added to KRS 439.3401(2). Nor do we perceive any legislative intent in the 1998 amendments of KRS 532.060(2)(a) and KRS 532.110(1)(c) to affect the *Sanders* interpretation of KRS 439.3401(3).

Accordingly, the judgment of conviction and sentence imposed by the Fayette Circuit Court are affirmed and the interpretation of KRS 439.3401(3) set forth in *Sanders v. Commonwealth, supra,* is reaffirmed.

LAMBERT, C.J.; GRAVES, JOHNSTONE and WINTERSHEIMER, JJ., concur.

KELLER, J., concurs by separate opinion, with STUMBO, J., joining that concurring opinion.

KELLER, Justice, concurring.

I concur in the result reached by the majority because I agree that "substantial evidence support[ed] the trial judge's finding that Dials had a reasonable belief that Keisha Hughes might be inside the apartment and in need of emergency assistance,"[1] and, thus, I believe that the warrantless search of the apartment was reasonable in light of these exigent circumstances. I write separately, however, because the majority disregards its role as a reviewing court when it suggests that the inevitable discovery exception to the exclusionary rule provides an alternative justification for the trial court's denial of Appellant's suppression motion. The trial court's ruling did not address the inevitable discovery exception, and the parties to this appeal have not alleged that the exception has any relevance to the issues before the Court. In fact, the first suggestion that the inevitable discovery exception had any relevance to this case came during oral argument when the author of today's majority opinion asked Appellant's counsel to address the exception's applicability. Further, the majority's alternative rationale is, at best, unnecessary because we affirm the trial court's ruling on the basis of the factual

---

**1.** Majority Opinion at 87 S.W.3d 850, 852 (2002) (Slip Op. at 4).

findings *actually made by the trial court.* I write separately, however, because of my concern that the majority opinion creates bad precedent that appears to authorize Kentucky appellate courts to initiate their own factual determinations as to issues of inevitable discovery.

Each of the inevitable discovery cases cited by the majority opinion is similar in at least one (1) respect—they all involve *appellate review of a trial court's determination* that evidence was admissible under the inevitable discovery exception.[2] In addition, I observe that in the only reported Kentucky case addressing the inevitable discovery exception, *Commonwealth v. Elliott,*[3] the Court of Appeals affirmed a *trial court's determination* "that the prosecution could not prove by a preponderance of the evidence that the drugs seized would have been ultimately discovered by lawful means."[4] The reason for the procedural similarity across the board is that an inevitable discovery determination is a mixed question of fact and law,[5] and trial courts are responsible for rendering findings of fact after evaluating evidence and witness credibility.[6] Although appellate courts review *de novo* trial courts' determinations that illegally-obtained evidence is admissible under the inevitable discovery exception,[7] the initial determination must be made by the trial court.

In this regard, I find the procedural history of the United States Supreme Court's adoption of the inevitable discovery exception instructive. In *Brewer v. Williams,*[8] the precursor to *Nix v. Williams,*[9] the Court affirmed a grant of habeas relief where, at trial, the prosecution had introduced Williams's post-arrest incriminating statements concerning the location of his victim's body that were obtained in violation of Williams's Sixth Amendment right to counsel. Acting upon the information in Williams's incriminating statements, and with Williams's assistance, authorities located the body of the fourteen (14) year old girl whom Williams had murdered. Although the Court found that the erroneous admission of the unlawfully-obtained statements deprived Williams of

---

2. *See Nix v. Williams,* 467 U.S. 431, 438, 104 S.Ct. 2501, 81 L.Ed.2d 377, 383 (1984) ("The trial court concluded that the State had proved by a preponderance of the evidence that, ... if Williams had not led the police to the victim, her body would have been discovered *'within a short time'* in essentially the same condition as it was actually found." (emphasis in original)); *United States v. Scott,* 270 F.3d 30, 42 (1st Cir.2001) ("The district court found [the inevitable discovery exception] to apply to Scott's case, and we agree."), *cert. denied,* — U.S. —, 122 S.Ct. 1583, 152 L.Ed.2d 501 (2002); *United States v. Kimes,* 246 F.3d 800, 803–04 (6th Cir.2001) ("The magistrate ... concluded ... that the knives were admissible under the "inevitable discovery" exception to the exclusionary rule. The magistrate's conclusions were adopted by the district judge."), *cert. denied,* — U.S. —, 122 S.Ct. 823, 151 L.Ed.2d 705 (2002); *United States v. Ford,* 184 F.3d 566, 578 (6th Cir.1999) ("The district court ... [held] that the seized documents would have inevitably been discovered without the illegal search."), *cert. denied* 528 U.S. 1161, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000).

3. Ky.App., 714 S.W.2d 494 (1986).

4. *Id.* at 497.

5. *United States v. Kennedy,* 61 F.3d 494, 497 (6th Cir.1995), *cert. denied* 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996).

6. *See* RCR 9.78; *Mills v. Commonwealth,* Ky., 996 S.W.2d 473 (1999), *cert. denied,* 528 U.S. 1164, 120 S.Ct. 1182, 145 L.Ed.2d 1088 (2000).

7. *Id., citing United States v. Boatwright,* 822 F.2d 862 (9th Cir.1987).

8. 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

9. *Supra* note 2.

due process and entitled him to a new trial, it did not address the admissibility of tangible evidence concerning the victim's body, and instead suggested that the state courts should address the admissibility of that evidence prior to retrial:

> The District Court stated that its decision "does not touch upon the issue of what evidence, if any, beyond the incriminating statements themselves must be excluded as 'fruit of the poisonous tree.'" We, too, have no occasion to address this issue, and in the present posture of the case, there is no basis for the view of our dissenting Brethren, that any attempt to retry the respondent would probably be futile. While neither Williams' incriminating statements themselves nor any testimony describing his having led the police to the victim's body can constitutionally be admitted into evidence, evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams. *In the event that a retrial is instituted, it will be for the state courts in the first instance to determine whether particular items of evidence may be admitted.*[10]

Prior to Williams's second trial, the state trial court allowed the prosecution to introduce "evidence of the condition of [the victim's] body as it was found, articles and photographs of her clothing, and the results of post mortem medical and chemical

tests on the body,"[11] on the theory that the evidence would have been discovered without Williams's incriminating statements. Williams was again convicted of murder, the Supreme Court of Iowa affirmed the conviction, and Williams again petitioned the federal courts for habeas relief. After its own independent review of the evidence, the United States District Court concluded that the police inevitably would have found the body and therefore denied Williams's habeas petition. The Court of Appeals reversed because it found the trial court's findings inadequate. The United States Supreme Court granted certiorari, held that inevitable discovery represented an exception to the exclusionary rule,[12] and, after analyzing the appropriate burden of proof[13] and reviewing the evidence introduced at the suppression hearing, agreed with the trial court's conclusion that the authorities inevitably would have found the girl's body:

> [T]hree courts independently reviewing the evidence have found that the body of the child inevitably would have been found by the searchers. Williams challenges these findings, asserting that the record contains only the "post hoc rationalization" that the search efforts would have proceeded two and one-half miles into Polk County where Williams had led police to the body.

> . . .

> On this record it is clear that the search parties were approaching the actual location of the body, and we are

10. *Brewer v. Williams*, *supra* note 8 at 430 U.S. 387, 406 n. 12, 97 S.Ct. 1232, 51 L.Ed.2d 424, 441 n. 12 (citations omitted and emphasis added).

11. *Nix v. Williams*, *supra* note 2 at 467 U.S. 431, 437, 104 S.Ct. 2501, 81 L.Ed.2d 377, 383.

12. *Id.* at 467 U.S. 431, 448, 104 S.Ct. 2501, 81 L.Ed.2d 377, 390 ("[W]hen ... the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible.").

13. *Id.* at 467 U.S. 431, 444 n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377, 388 n. 5.

satisfied, along with three courts earlier, that the volunteer search teams would have resumed the search had Williams not earlier led the police to the body and the body inevitably would have been found. The evidence asserted by Williams as newly discovered, i.e., certain photographs of the body and deposition testimony of Agent Ruxlow made in connection with the federal habeas proceeding, does not demonstrate that the material facts were inadequately developed in the suppression hearing in state court or that Williams was denied a full, fair, and adequate opportunity to present all relevant facts at the suppression hearing.[14]

In contrast, today's majority has before it no trial court determination relating to inevitable discovery, yet nonetheless concludes that the exception supports the trial court's ruling denying Appellant's motion to suppress. In doing so, the majority engages in inappropriate appellate fact-finding and offers what is, in essence, an advisory opinion. The majority's assertion that the evidentiary conclusion it reaches is "indisputable" does not alter the fact that, by evaluating testimony and predicting what would have happened if the officers had not searched the apartment when they did, the majority acts as a fact-finder, not as an appellate court. Accordingly, I write separately from the majority to express my opinion that this Court should limit its consideration of the inevitable discovery exception to those cases where the trial court's findings of fact and conclusions of law raise an inevitable discovery issue. The Commonwealth has the burden of proving "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."[15] Accordingly, if the Com-

monwealth predicates the admissibility of an item of evidence upon the exception, it should advance that argument—and introduce evidence in support of it—at an evidentiary hearing so that the trial court can consider the issue and make a determination subject to meaningful appellate review.

STUMBO, J., joins this concurring opinion.

14. *Id.* at 467 U.S. 431, 448–450, 104 S.Ct. 2501, 81 L.Ed.2d 377, 390–391.

15. *Id.* at 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377, 387–388.