STATE of Wisconsin, Plaintiff-Respondent,

v.

Marchand GRADY, Defendant-Appellant-Petitioner.

Supreme Court

*No. 2007AP672–CR. Oral argument November 6, 2008.
—Decided June 11, 2009.*

2009 WI 47

(Also reported in 766 N.W.2d 729.)

For the defendant-appellant-petitioner there were briefs by *Carl W. Chesshir,* Eagle, and oral argument by *Carl W. Chesshir.*

For the plaintiff-respondent the cause was argued by *Warren D. Weinstein,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. MICHAEL J. GABLEMAN, J. This is a review of an unpublished decision of the court of appeals[1] summarily affirming the entry of a judgment of conviction by the Circuit Court for Milwaukee County, Charles F. Kahn, Judge, against Marchand Grady ("Grady"). Grady was convicted of first-degree intentional homicide while armed with a dangerous weapon as a party to a crime, possession of a short-barreled shotgun as a party to a crime, and possession of a firearm by a felon. Grady contends that the circuit court erred by denying his motion to suppress inculpatory statements that he made to police officers while in custody. The court of appeals disagreed and upheld the denial of Grady's motion.

¶ 2. The issue we decide today is whether Grady's Fifth Amendment rights were violated when *Miranda*[2] warnings were given to him before the start of his noncustodial interrogation, but not administered again after his interrogation became custodial during the same interview two-and-one-half hours later. Grady argues that he was entitled to be readvised of his *Miranda* rights after his interrogation became custodial, and because those warnings were not readministered, his inculpatory statements should have been suppressed.

¶ 3. We reject Grady's bright-line rule approach, and reiterate that the proper framework for analyzing

---

[1] *State v. Grady,* No. 2007AP672–CR, unpublished order (Wis. Ct. App. Jan. 28, 2008).

[2] *Miranda v.* Arizona, 384 U.S. 436 (1966).

the sufficiency of the timing of *Miranda* warnings is a totality of the circumstances test. In this case, we hold that Grady was not entitled to a readministration of the *Miranda* warnings after he was arrested. The evidence shows that Grady was read his *Miranda* warnings only two-and-one-half hours prior to the commencement of the custodial portion of his interrogation, there was no significant change in the nature of his interrogation after it became custodial, Grady showed no signs of mental impairment, he was familiar with *Miranda* warnings from his past, and, though not readministered, Grady was reminded of his *Miranda* rights after he was taken into custody. In sum, it is clear that the *Miranda* warnings as administered made Grady sufficiently aware of his rights during questioning. Grady's motion to suppress his inculpatory statements was therefore appropriately denied by the circuit court, and we affirm the decision of the court of appeals upholding that denial.

## I. BACKGROUND

¶ 4. The underlying facts are undisputed. On May 16, 2005, Allen Jemison was found dead in his apartment as the result of two shotgun wounds. Jemison's roommate, Marcus Ward, immediately became the subject of the police investigation. The police also made contact with Grady, who reported that he knew Ward. Grady agreed to call the police if and when he saw Ward. Later that evening, Grady did call the police and assisted them in finding Ward. Grady then voluntarily went to the police station and agreed to answer some questions. The police repeatedly told Grady that he was not under arrest; he was not handcuffed during the ride to the station or once he arrived at the station. Grady

was provided with food, water, cigarettes, and bathroom breaks throughout the ensuing questioning.

¶ 5. At 8:16 p.m., Detective Corbett began the interview by administering *Miranda* warnings to Grady so as to be "better safe than sorry," and Grady indicated that he understood the rights he was read. Grady had received *Miranda* warnings on at least one prior unrelated occasion. For the next two-and-one-half hours, Grady answered questions from Detectives Corbett and Gastrow, denying any involvement in Jemison's death. It is undisputed that Grady was not in custody at this time.

¶ 6. At approximately 10:45 p.m. that evening, Ward, who was being questioned separately, told the police that Grady was the person who shot and killed Jemison. At this point, Grady was placed under arrest. *Miranda* warnings were not readministered to Grady upon his arrest, though Grady did testify at the hearing on his motion to suppress that, when he was arrested, Detective Gastrow slid a card to him across the table with the *Miranda* warnings printed on it and asked Grady if he knew the rights referenced therein. Grady claimed that he looked at the card and slid it back to Gastrow, who picked it up and put it away. Neither party alleges that this episode constituted an administration of the *Miranda* warnings.

¶ 7. From 10:45 p.m. on May 16 until 5:25 a.m. on May 17, Detectives Corbett and Gastrow conducted a custodial interrogation of Grady. At some point prior to 12:25 a.m., Grady began making inculpatory statements regarding his involvement in Jemison's death. The detectives suspended the interrogation between 12:25 a.m. and 12:55 a.m. in order to brief the incoming shift of officers. Detectives Corbett and Gastrow then resumed their custodial interrogation of Grady, who

continued to make inculpatory statements. Detective Corbett spent several hours during the interrogation reducing Grady's statement to writing. While Grady declined to sign the statement, he orally acknowledged that it was true and correct.

¶ 8. Grady was booked into detention immediately following the conclusion of the interrogation on the morning of May 17, 2005. In total, Grady's all-night questioning (the "first interrogation") lasted slightly more than nine hours, with the noncustodial portion composing the first two-and-one-half hours of the interrogation. Grady continued to receive food, cigarettes, water, and restroom breaks throughout the first interrogation.

¶ 9. Later that night, Detectives Corbett and Gastrow began another round of questioning (the "second interrogation") to clarify inconsistencies from the first interrogation. It is undisputed that this second custodial interrogation began with Detective Corbett administering the *Miranda* warnings to Grady, who stated that he remembered being read his rights the previous day, understood them, and was willing to speak to the police without an attorney. Grady spoke with the detectives from 7:33 p.m. until 11:17 p.m., during which he made additional inculpatory statements. Detective Corbett prepared another written statement based upon Grady's answers, which Grady indicated was true and correct. Grady then initialed each page and signed the statement.

¶ 10. Prior to trial, Grady moved to suppress the statements he made and signed during the interrogations on the grounds that they were the involuntary products of police coercion. The circuit court found the statements to be voluntary and denied the motion, stating that Grady understood his rights, and that he

351

"knew exactly what he was doing and was not the subject of improper police coercion when he provided the information to the police."

¶ 11. At trial, both of Grady's statements were admitted into evidence during the State's case-in-chief. The jury returned guilty verdicts on all three counts, and the circuit court correspondingly entered a judgment of conviction on all three counts.

¶ 12. Grady appealed the circuit court's denial of his motion to suppress. On appeal, Grady conceded that he was not improperly coerced by the police, but maintained that his statements should be suppressed because he was not given his *Miranda* warnings after he was placed into custody. The court of appeals summarily affirmed the circuit court's judgment of conviction, rejecting Grady's argument "that *Miranda* warnings have no effect simply because officers take the precaution of reading *Miranda* rights before they are required." The court of appeals concluded: "[T]he record amply supports the circuit court's findings that the *Miranda* admonitions were fully understood and the postcustodial statement by Grady was voluntary and intelligently given." Grady then sought review before this court.

## II. APPLICABLE LEGAL STANDARDS

¶ 13. In reviewing a motion to suppress, we uphold the circuit court's findings of fact unless they are clearly erroneous, and review the application of constitutional principles to those facts de novo. *See State v. Eason*, 2001 WI 98, ¶ 9, 245 Wis. 2d 206, 629 N.W.2d 625.

¶ 14. The Fifth Amendment to the United States Constitution guarantees the privilege against compelled self-incrimination,[3] and the Fourteenth Amendment requires state courts to observe this privilege. *See Malloy v. Hogan,* 378 U.S. 1, 6 (1964). The United States Supreme Court created procedural safeguards to protect the right against compelled self-incrimination in *Miranda v. Arizona,* holding as follows:

> [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning . . . [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. 436, 478–79 (1966). Failure to comply with these constitutional safeguards renders the person's statements inadmissible against that person. *Id.*

## III. DISCUSSION

¶ 15. Grady advances a creative, but not heretofore unheard of argument. He asks us to adopt a bright-line rule requiring the administration of *Miranda* warnings after a person is placed in official custody, and asks us to declare any and all *Miranda*

---

[3] The Fifth Amendment provides in pertinent part: "No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

warnings prior to custody ipso facto ineffective.[4] We are unpersuaded that a bright-line rule is necessary or even desirable, and reiterate that the proper approach for determining whether a suspect has effectively received his *Miranda* warnings is a totality of the circumstances test. Grady did receive the requisite *Miranda* warnings at the beginning of his noncustodial interrogation, and in light of the facts of this case, we do not believe the police were required to readminister those warnings once his interrogation became custodial two-and-one-half hours later.

## A. Totality of the Circumstances Test

¶ 16. Grady's argument is basically this—because *Miranda* warnings are required before a custodial interrogation commences, and are not required for noncustodial interrogations, *Miranda* warnings are effective only after a person has been placed in custody. In our opinion, this argument constitutes an inaccurate interpretation of the requirements of *Miranda* and poor public policy. We do not find much merit in this approach, and neither have the overwhelming majority of other courts who have considered this question. A sound interpretation of *Miranda* and sound public policy require the application of the totality of the circumstances test rather than a bright-line rule, and that is what we do here.

¶ 17. The United States Supreme Court has made clear its reluctance to adopt per se rules in the context

---

[4] The *Miranda* court repeatedly referred to the valid and legally sufficient advisement of a suspect's constitutional rights as an "effective" advisement or warning. *See,* 384 U.S. at 467, 470, 473, 494, 498. We use the terms "effective" and "ineffective" in this same sense.

of *Miranda* warnings. Instead of delineating bright-line rules, the Supreme Court has embraced a more flexible approach whereby courts consider the totality of the circumstances. *See Wyrick v. Fields,* 459 U.S. 42, 47–49 (1982) (per curiam) (rejecting a per se rule that *Miranda* rights be readministered before questioning a suspect about the results of a polygraph examination, and reiterating that the proper framework is a totality of the circumstances inquiry).

¶ 18. Grady nonetheless argues that his bright-line rule is required by *Miranda.* It is true that *Miranda* necessitates the administration of the warnings only after custody, and that precustodial warnings are not required. *See Miranda,* 384 U.S. at 478–79. This plainly does not mean, as Grady contends, that *Miranda* warnings before custody are per se ineffective. The *Miranda* opinion sets no requirement as to the earliest time that the warnings may be given; it requires only that the warnings be given at some time "prior to any [custodial] questioning." *Id.*; *see also State v. Burge,* 487 A.2d 532, 543 (Conn. 1985) ("The disclosure that *Miranda* requires must be made *no later than* the time when an accused is taken into custody" Emphasis added)). Grady's argument, then, trips on its own logic. The fact that *Miranda* warnings are required before the commencement of a custodial interrogation does not mean that precustodial warnings are always ineffective.

¶ 19. Numerous other jurisdictions have considered this same question, and all but one have rejected Grady's approach.[5] The weight of authority, indeed the

[5] The only case we were able to find where a court did create a bright-line rule deeming all precustody *Miranda* warnings per

overwhelming consensus, agrees that precustodial administration of *Miranda* warnings can be sufficient under certain circumstances.[6]

se ineffective is *State v. Bradshaw,* 457 S.E.2d 456 (W. Va. 1995). As our opinion today makes clear, we do not find the reasoning in *Bradshaw* persuasive.

[6] *See, e.g., Guam v. Dela Pena,* 72 F.3d 767, 770 (9th Cir. 1995) (holding that precustodial *Miranda* warnings were sufficient when the defendant confessed 15 hours later and did not allege that anything diminished the effectiveness of the warnings other than the passage of time); *Jarrell v. Balkcom,* 735 F.2d 1242, 1253–54 (11th Cir. 1984) (holding that precustodial *Miranda* warnings were sufficient when the defendant confessed less than four hours after the warnings and there was no evidence that the defendant was unaware of his rights, that he was pressured, or that he did not understand the interrogation process); *Upton v. State,* 36 S.W.3d 740, 743–44 (Ark. 2001) (holding that precustodial *Miranda* warnings were sufficient when the defendant was questioned by the same officer after arrest, confessed within two hours of being given the warnings, and there was no evidence that the defendant did not understand the warnings); *State v. Burge,* 487 A.2d 532, 542–43 (Conn. 1985) (holding that precustodial *Miranda* warnings were sufficient when the defendant was mentally aware, "continuously in the company of the police, questioned on the same subject by the same officers throughout that time, and confessed within four hours of having been given the warnings"); *State v. Tolbert,* 850 A.2d 1192, 1200 (Md. 2004) (holding that the precustodial *Miranda* warnings were "sufficiently proximate in time and place to custodial status to inform" the defendant of his constitutional privilege against self-incrimination, and thus readministration of the rights was not required); *Commonwealth v. Colby,* 663 N.E.2d 808, 810–11 (Mass. 1996) (holding that precustodial *Miranda* warnings were sufficient when given less than two hours prior to the defendant's confession and there was no break in the interrogation process); *State v. Monroe,* 711 A.2d 878, 886–87 (N.H. 1998) (holding that defendant's pre-polygraph, precustodial *Miranda* warnings sufficiently safeguarded his rights where

¶ 20. Though the precise framing of the analysis varies from state to state, the general approach is the same. The main thrust of the inquiry is whether the suspect being questioned was sufficiently aware of his or her rights during the custodial interrogation. Though still under a "totality of the circumstances" rubric, courts have considered multiple factors in making this determination,[7] including whether the same officer or officers conducted the questioning, whether

defendant's "conduct gave no indication that his comprehension and volition had been affected so as to render the warning ineffective," and where interrogation did not become significantly more coercive); *State v. Dispoto*, 913 A.2d 791, 801 (N.J. 2007) (holding that no further warnings were required when "precustodial warnings have been given to a defendant as part of a continuing pattern of interactions between the defendant and the police, and during that continuing sequence of events nothing of an intervening nature occurs that would dilute the effectiveness of the warnings that had been given"); *State v. Rogers*, 188 S.W.3d 593, 606–08 (Tenn. 2006) (holding that no new administration of *Miranda* rights was required when there was a five-hour lapse between defendant's waiver of his *Miranda* rights and the confession, where the same two officers conducted the precustodial and postcustodial questioning, where the subject matter remained the same throughout, where the defendant was familiar with the criminal justice system, and where nothing indicates the confession was involuntary); *State v. Rupe*, 683 P.2d 571, 581 n.4 (Wash. 1984) (holding that precustodial *Miranda* warnings were sufficient in light of the short period of time between advisement of his rights and being placed in custody); *see also* 2 Wayne R. LaFave, *Criminal Procedure* § 6.8(b), at 807 nn.62–63 (3d ed. 2007) (citing *Burge* and other cases for the proposition that precustodial *Miranda* warnings may be sufficient).

[7] For example, Tennessee has proffered the following approach:

the location changed, whether the subject matter of the questioning was consistent, whether a reminder of the *Miranda* rights was given before the custodial interrogation began, whether the suspect was mentally or emotionally impaired, whether more coercive tactics were used when the suspect was placed in custody, the suspect's past experience with law enforcement, and how much time elapsed between the administration of the *Miranda* warnings and the custodial interrogation or confession. The Miranda warnings would tend to go "stale" sooner, that is, they would be more likely to be forgotten by the suspect, if the suspect has had little familiarity with the warnings than if the suspect has had experience with the warnings.

¶ 21. We do not here adopt any formulaic test. The above factors are helpful, but not individually or collectively determinative or exhaustive. We prefer a flexible approach that examines all relevant facts in an

---

Factors to be considered when assessing the totality of the circumstances include: (1) the amount of time that has passed since the waiver; (2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; (3) any official reminder of the prior advisement; (4) the suspect's sophistication or past experience with law enforcement; and (5) any indicia that the suspect subjectively understands and waives his rights.

*Rogers*, 188 S.W.3d at 606 (citing *People v. Mickle,* 814 P.2d 290, 305 (Cal. 1991)). The Eleventh Circuit inquires into whether the suspect was aware of his rights, pressured, or "mentally deficient or naive about the process that was under way." *Jarrell,* 735 F.2d at 1254. Connecticut similarly asks whether the warnings given were "sufficiently proximate in time and place to custodial status to serve as protection" against coercion. *Burge,* 487 A.2d at 543.

effort to determine whether a suspect was sufficiently aware of his or her constitutional rights.

¶ 22. Another problem with Grady's bright-line approach is that it does not align with the purpose of *Miranda* warnings. *Miranda* warnings are designed to make a suspect who is in custody aware of his or her constitutional rights before interrogation, and relatedly, to inform the suspect that the interrogators will recognize his or her rights if exercised. *Miranda*, 384 U.S. at 468; *see also Hughes v. Commonwealth*, 87 S.W.3d 850, 854 (Ky. 2002). The goal is to protect the privilege against self-incrimination, or said another way, to ensure that a confession is free and unconstrained. *See State v. Hambly*, 2008 WI 10, ¶ 48, 307 Wis. 2d 98, 745 N.W.2d 48 (noting that *Miranda* is designed to prevent "government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment") (quoting *State v. Cunningham*, 144 Wis. 2d 272, 280–81, 423 N.W.2d 862 (1988)). As the Connecticut Supreme Court has noted:

> The purpose of *Miranda* warnings is to assure that a confession is "the product of an essentially free and unconstrained choice by its maker." No such choice is "free and unconstrained" unless the accused, before making statements to the police, is aware that he has the constitutional right to remain silent. Adequate disclosure of the jeopardy in which the accused is being placed is therefore important to alert him to the importance of the constitutional rights which he is being asked to forego. *Burge*, 487 A.2d at 542–43 (citations omitted).

¶ 23. Given this purpose, a rule that assumes a suspect is a blank slate with no awareness of his or her

359

rights as soon as he or she is placed in custody is a head-in-the-sand approach. In addition, application of Grady's bright-line rule would focus the analysis on the custody status of a suspect rather than on the individual's comprehension and waiver of his rights. It is, in short, form over substance. A rule that says warnings given one minute before custody are ineffective per se because they were not given when the suspect was actually in custody is manifestly unreasonable.

¶ 24. Finally, beyond its lack of fidelity to the purposes and principles behind *Miranda*, Grady's approach is unworkable. One of its major flaws is that it assumes that the precise point of custody is fixed and known at the time of questioning. While this may sometimes be the case, it is not always true. In practice, it is not always clear when a suspect is officially under arrest. *See Burge*, 487 A.2d at 543 ("When the police are conducting a good faith precustodial investigation at police headquarters, they may have difficulty in determining the precise moment when questioning turns into custodial interrogation and *Miranda* warnings are required."). Because of this indeterminacy, officers currently have an incentive to provide early warnings in order to ensure both maximum awareness of rights and the admissibility of subsequent statements. Grady's rule might have the perverse effect of eliminating the "better safe than sorry" approach, leading to suspects who are less apprised of their rights than under the current system.

¶ 25. Grady's bright-line rule, then, must be rejected. The policies and purposes underlying *Miranda* require a flexible approach that examines the totality of the circumstances to determine the sufficiency of *Miranda* warnings.

## B. Application to the Facts of this Case

¶ 26. In view of the totality of the circumstances in the case at bar, it is clear that Grady was not denied his Fifth Amendment rights. Grady was questioned by the same officers, in the same place, on the same subjects during his precustodial and postcustodial interrogation. His postcustodial interrogation was merely a continuation of the precustodial questioning, the only differences being his formal arrest and new status as a suspect in the homicide.

¶ 27. There is also no evidence in the record to suggest that the questioning became more coercive once Grady was arrested. In fact, the record indicates Grady remained cooperative and voluntarily conversational.[8] He was given frequent breaks and food both before and after he was arrested.

¶ 28. Additionally, we have no indication that Grady was impaired in any way, or any suggestion that his comprehension of his rights was diminished when he made his inculpatory statements. The time factor here, a mere two-and-one-half hours between the *Miranda* warnings and his arrest, also supports his

---

[8] Our discussion of voluntariness is not meant to implicate the type of voluntariness discussed in *State ex rel. Goodchild v. Burke,* 27 Wis. 2d 244, 133 N.W.2d 753 (1965). Though they are related, *Goodchild* considers the voluntariness of statements obtained through physical and psychological coercion. Grady initially alleged this type of coercion, but abandoned these claims on appeal. *Miranda* is concerned with a suspect's awareness of his or her rights. In this inquiry, as discussed above, whether the interrogation became more coercive is a factor to be considered in evaluating whether the suspect was aware of his or her rights and voluntarily waived them.

awareness of his rights. Grady, having been given *Miranda* warnings on at least one other separate occasion, understood what was at stake. He was even reminded of his rights in an informal way at the beginning of his custodial interrogation—the *Miranda* card that had been read to him earlier was shown to him again (though not read).

¶ 29. Based upon these facts, we see no intervening circumstances that would have rendered Grady's precustodial *Miranda* warnings ineffective. We conclude there is no evidence to support the notion that Grady's inculpatory statements were made without being sufficiently aware of his rights. Grady may regret his admissions, but "[a]bsent some officially coerced self-accusation [or unknowing or unintelligent waiver], the Fifth Amendment privilege is not violated by even the most damning admissions." *United States v. Washington,* 431 U.S. 181, 187 (1977) (emphasis omitted). Grady knew and understood his rights before he was arrested mid-interrogation. Grady still knew and understood his rights after his arrest. Nothing in the record demonstrates any diminishment of that understanding.

¶ 30. Therefore, the inculpatory statements made during Grady's first interrogation were not obtained in violation of Grady's Fifth Amendment rights. In light of this conclusion, we need not address Grady's argument that the inculpatory statements he made during his second interrogation should be suppressed as well.

## IV. CONCLUSION

¶ 31. We reject Grady's bright-line rule approach, and reiterate that the proper framework for analyzing the sufficiency of the timing of *Miranda* warnings is a

totality of the circumstances test. In this case, we hold that Grady was not entitled to a readministration of the *Miranda* warnings after he was arrested. The evidence shows that Grady was read his *Miranda* warnings only two-and-one-half hours prior to the commencement of the custodial portion of his interrogation, there was no significant change in the nature of his interrogation after it became custodial, Grady showed no signs of mental impairment, he was familiar with *Miranda* warnings from his past, and, though not readministered, Grady was reminded of his *Miranda* rights after he was taken into custody. In sum, it is clear that the *Miranda* warnings as administered made Grady sufficiently aware of his rights during questioning. Grady's motion to suppress his inculpatory statements was therefore appropriately denied by the circuit court, and we affirm the decision of the court of appeals upholding that denial.

*By the Court.*—The opinion and order of the court of appeals is affirmed.