# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2010AP2809-CR |
| COMPLETE TITLE: | State of Wisconsin, Plaintiff-Respondent, v. Matthew A. Lonkoski, Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 339 Wis. 2d 490, 809 N.W.2d 900
(Ct. App. 2012 – Unpublished)

| | |
|---|---|
| OPINION FILED: | April 9, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 25, 2013 |

| SOURCE OF APPEAL: | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Oneida |
| JUDGE: | Mark Mangerson |

| JUSTICES: | |
|---|---|
| CONCURRED: | |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *Andrew Hinkel*, assistant state public defender, and oral argument by *Andrew Hinkel*.

For the plaintiff-respondent, the cause was argued by *Warren D. Weinstein*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2010AP2809-CR
(L.C. No. 2009CF80)

STATE OF WISCONSIN           :        IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

  **v.**

**Matthew A. Lonkoski,**

      **Defendant-Appellant-Petitioner.**

**FILED**

**APR 9, 2013**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 N. PATRICK CROOKS, J. This is a review of an unpublished decision of the court of appeals that affirmed the judgment of conviction entered by the circuit court for Oneida County, the Honorable Mark Mangerson presiding.[1]

¶2 At issue in this case is the admissibility of statements made to detectives in an interrogation. The threshold question is whether Matthew A. Lonkoski was in police

---

[1] State v. Lonkoski, No. 2010AP2809-CR, unpublished slip op. (Wis. Ct. App. Jan. 18, 2012).

custody for purposes of Miranda[2] when he stated that he wanted an attorney. Within moments of stating he wanted a lawyer, Lonkoski clearly retracted his statement and thereafter repeatedly and emphatically stated that he wanted to talk to the officers without a lawyer. However, if he was already in custody for Miranda purposes at the time he stated, "I want a lawyer," he would receive the benefit of the Miranda rule requiring interrogation to cease, and his subsequent statements would be subject to the exclusionary rule if other exceptions to Miranda did not apply. Where a person is not in custody, there is no such requirement to cease interrogation.

¶3 The circuit court first granted Lonkoski's motion to suppress all statements he made after he stated that he wanted an attorney on the grounds that an Edwards[3] violation had occurred. On reconsideration, the circuit court denied the motion to suppress, focusing its analysis on the fact that Lonkoski was not in custody when he stated he wanted an attorney and therefore found that no Edwards violation had occurred. The court of appeals affirmed.

¶4 After the circuit court denied Lonkoski's motion to suppress, he pleaded guilty and was convicted of child abuse—

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] Edwards v. Arizona, 451 U.S. 477, 483-85 (1981) (holding that further interrogation is permissible after an accused invokes a right to counsel if the State can show that the accused initiated the further communications, exchanges, or conversations and that the accused knowingly, intelligently, and voluntarily waived his right to counsel).

recklessly causing great bodily harm in violation of Wis. Stat. § 948.03(3)(a)[4] and neglecting a child resulting in the child's death in violation of Wis. Stat. § 948.21(1)(d).

¶5 We hold that the circuit court properly denied the motion to suppress because Lonkoski was not in custody when he asked for an attorney, and therefore, Miranda did not bar further interrogation by the officers.

¶6 A person is in "custody" if under the totality of the circumstances "a reasonable person would not feel free to terminate the interview and leave the scene." State v. Martin, 2012 WI 96, ¶33, 343 Wis. 2d 278, 816 N.W.2d 270. "[A] court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (citations omitted) (internal quotation marks omitted). Several factors have been considered relevant in the totality of the circumstances such as "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint." Martin, 343 Wis. 2d 278, ¶35.

¶7 Lonkoski came to the sheriff's department without being asked and voluntarily submitted to questioning by law enforcement officers. Although he was questioned in a small

---

[4] All references to the Wisconsin Statutes are to the 2009-10 version unless otherwise noted.

room within a jail by two officers with the door closed, the circuit court found that it was a typical interrogation setting locked to ingress by individuals but not for egress; he was never restrained in any way; and the door was opened more than once by people entering or exiting. In fact, on one occasion when the officers left the room, one of the officers asked Lonkoski whether he preferred the door to the interrogation room to be open or shut. Furthermore, Lonkoski was told that he was not under arrest and that the officers were not accusing him. In the totality of the circumstances, a reasonable person in Lonkoski's position at the time he stated he wanted an attorney would believe that he or she was "free to terminate the interview and leave the scene." We decline to adopt Lonkoski's argument that <u>Miranda</u> applies when custody is "imminent."[5] Accordingly, although our analysis differs from that of the court of appeals, we affirm its decision.

## I.

¶8 Lonkoski's ten-month-old daughter, Peyton, was found unresponsive by her parents, Lonkoski and Amanda Bodoh. The medical personnel and law enforcement officers who responded to a 911 call declared her dead at the scene. An autopsy showed that Peyton's blood and urine contained deadly amounts of morphine and hydromorphone.

---

[5] The State argues that even if Lonkoski was in custody, Lonkoski reinitiated the conversation with the officers under <u>Edwards</u> such that his subsequent statements are admissible. Because we decide that Lonkoski was not in custody, we need not address this argument.

4

¶9 After receiving the autopsy results, a detective from the Oneida County Sheriff's Department requested that Bodoh come in for an interview. Lonkoski drove her to the sheriff's department for the interview. Officers spoke with Bodoh while Lonkoski waited in the lobby. After some time, Bodoh was escorted to a different part of the sheriff's department. Lieutenant Jim Wood went to the lobby. Subsequently, Lonkoski came to the interview room that Bodoh had recently vacated. To get to the room, someone at the front desk would have needed to push a button to release the door, and the room was located down a hallway from the lobby. The door did not prevent a person from exiting into the lobby from the interview area.

¶10 Detective Sara Gardner and Lieutenant Wood conducted the interview of Lonkoski. The interview room was small, and Lonkoski was seated furthest from the door. The entire interrogation was video-recorded.

¶11 At the beginning of the interview, the following occurred:

Wood: You want to have a seat over there? Do you know Sara?

Lonkoski: Yes.

Gardner: Yeah very well. How are you?

Lonkoski: Very good. How have you been?

Gardner: Well, better than you from what I hear's been going on.

Wood: Matt I'll, I'll close the door. You're not under arrest. You understand that you guys came here by yourself and we want to talk to you about Peyton

and Peyton's death and, um, let you know about some of the, ah, findings from the autopsy and everything.  I mean you're, you're the father, right?

Lonkoski: Mm hmm.  (Affirmative).

Wood: Are you okay talking to us?

Lonkoski: Yeah.

Wood: Okay, I've got the door closed just cause I don't want other people to hear and stuff okay?  Um, what what has gone on since Peyton's death with you?  How are you doin'?

¶12 The next 20 minutes or so of the interview consisted of Lonkoski recounting the events in the days leading up to Peyton's death.  The tenor of the conversation changed when Lieutenant Wood revealed the results of the autopsy to Lonkoski.  It was during this portion of the interrogation that Lonkoski made the statement——"I want a lawyer"——that is at the center of our analysis.

Wood: No, no. The autopsy shows that Peyton died of an overdose.

Lonkoski: An overdose?  Of what?

Wood: Now that's – I'd like for you to try and help me out a little bit.

Lonkoski: All I know is when I got back to the apartment, Amanda told me she gave, um, Peyton, baby Tylenol.  The bottle of baby Tylenol you guys seen when you guys went into the apartment was on top of the . . .

Wood: Not the baby Tylenol, I know.  It's morphine.

Lonkoski: What?

Wood: Morphine.

Lonkoski: What?

6

Wood: Morphine.

Lonkoski: Oh my god.

Wood: What did you say to Peyton when you said goodbye to her that day out when I was out there and you went to the truck before they took her away . . . what'd you say to her?

Lonkoski: I said that I love her and I would be by her soon.

Wood: And that you were sorry?

Lonkoski: Sorry for her passing away.

Wood: There's, there's more to it.  And that's, and again Matt, it this is a very hard thing.  A hard thing for you as a, as a pop, and, and, this is your baby, but you gotta, you got to dig deep inside yourself now.  The autopsy knows what happened.  We know what happened.  What I need from you is I need you to look up and look in your heart and look up at Peyton and say, say okay, I can deal with it, I can, I can talk open . . . .

Lonkoski: Are you accusing me of giving my daughter morphine?

Gardner: Matt, Matt, look at me.  Every time you and I have talked, okay, and we go back a long way, all right, there's been some rough stuff that you and I have dealt with . . . .

Lonkoski: <u>I want a lawyer. I want a lawyer now. This is bullshit.</u>

Wood: Okay.

Lonkoski: I would never do that to my kid, ever.  I wasn't even at the apartment at all except at night. Why are you guys accusing me?

Wood: I didn't accuse you.

Gardner: We were asking.

Lonkoski: There is this is is is is is is is insane.

7

Wood: I have to stop talking to you though 'cause you said you wanted a lawyer.

Lonkoski: Am I under arrest?

Wood: You are now.

Lonkoski: Then I'll talk to you without a lawyer . . . I, I don't want to go to jail, I didn't do anything to my daughter, I would not lie to you guys—this is in fact life or death.

Wood: Well, now you, now you complicate things.

Lonkoski: I just, I just want to leave here and go by my mom now because this is in - this is, this is insane.

Gardner: Matt we can't, we can't talk to you just because you don't want to go to jail okay some things that we wanted to talk to you about were like Jim said—we know what happened to Peyton—we need to know a couple of the gaps to fill the gaps.

Lonkoski: All right....

Gardner: (Unintelligible).

Lonkoski: Ask those gaps.

Gardner: That's what we want you to talk to us about.

Lonkoski: Ask those gaps.

Gardner: But I don't want you to feel like we're accusing you.

Lonkoski: All right. I will calm down.

Gardner: I don't—you don't have to talk to us—okay.

Lonkoski: Can can I can we go smoke a can I smoke a cigarette when we do this?

Wood: What we're gonna do is—I'm gonna come back and, and again you have to be careful what you say....

Lonkoski: (Unintelligible).

8

Wood: If you want an attorney—you can have an attorney—we're gonna quit—what I'll do is I'll come back to you—go have a cigarette with Sara.

Lonkoski: Okay thank you.

Wood: Okay and I need to get more of the story.

Lonkoski: I will tell you everything I promise on my dead daughter's life and my (unintelligible) right now.

Wood: What I'm, what I'm gonna do is I'm gonna come back and I'll read you a Miranda card which is I'll read you your rights....

(Emphasis added).

¶13 Lonkoski's statement about wanting an attorney, made a few moments before he was placed under arrest, is the focal point of this case.

¶14 After the exchange excerpted above, Lonkoski was escorted out of the room to smoke a cigarette and use the bathroom. Meanwhile, a call between Wood and the district attorney can be heard on the video recording, with Wood apparently asking if he could continue talking to Lonkoski. When Lonkoski returned to the room, Wood read Lonkoski his Miranda rights, and Lonkoski agreed to additional questioning.[6]

---

[6] No one disputes the adequacy of Lonkoski's waiver of his Miranda rights after he was arrested.

Lonkoski made several incriminating statements during that interview and during two subsequent interviews in the following days.

¶15 After being charged, Lonkoski moved to suppress the incriminating statements he made to the officers after he had asked for an attorney. The circuit court reviewed the video of the interview, read briefs, and heard arguments from the parties on the admissibility of the statements.

¶16 The circuit court originally granted the motion to suppress on the grounds that the statements violated Edwards, stating, "we never really had a ceasing of the interrogation like Edwards requires . . . [It] wasn't a matter here of the defendant not reinitiating as much as it was the interrogation procedure never ending." At the circuit court's request, Lonkoski drafted an order for the court to sign. The order drafted included a finding that Lonkoski was "in custody" when he invoked his right to counsel. The State objected because no findings to that effect had been made by the circuit court. The

After Lonkoski returned from his cigarette break, Lonkoski inquired as to whether Wood had been able to talk to the district attorney. Wood said that he had and asked Lonkoski if he wished to talk to the officers further. Lonkoski said he did. Wood subsequently read the Miranda rights to Lonkoski. According to statements made by Wood and Lonkoski, Lonkoski was also given a written copy that he read. Wood asked Lonkoski if he understood; Lonkoski stated, "I understand everything." Wood then asked if he understood each of the rights; Lonkoski said, "Yes." Wood then stated, "Realizing that you have these Rights you are now willing to answer questions or make a statement?" and Lonkoski said, "Yes."

State moved for reconsideration, which the circuit court granted.

¶17 On reconsideration, the circuit court focused its analysis on the question of custody and found that Lonkoski was not in custody at the time he stated he wanted an attorney. In determining that Lonkoski was not in custody, the circuit court made the following findings of fact. First, it found that Lonkoski had been questioned by Detective Gardner for prior infractions, had a prior relationship with the officer, and was familiar with the Oneida County Sheriff's Department building.[7] Second, the door to the interview room was locked to prohibit ingress from the hallway but not egress to the hallway. Third, the officers' early questions were open-ended rather than accusatory. The questions were also largely related to establishing a cause of death rather than to identifying a homicide suspect. Fourth, after Lonkoski was arrested, he asked for and received both a cigarette break and a bathroom break. Fifth, Lonkoski was not physically restrained during the interrogation. Finally, Lonkoski arrived at the sheriff's department voluntarily. The circuit court held that because Lonkoski was not in custody when he stated that he wanted an attorney, Edwards v. Arizona did not apply. Therefore, the circuit court denied the suppression motion.

---

[7] We note that a suspect's history with law enforcement is not a factor in the objective determination of whether a suspect is in custody for Miranda purposes. Yarborough v. Alvarado, 541 U.S. 652, 668 (2004).

11

¶18 After the motion to suppress was denied, Lonkoski pleaded guilty to child abuse—recklessly causing great bodily harm in violation of Wis. Stat. § 948.03(3)(a) and neglecting a child resulting in the child's death in violation of Wis. Stat. § 948.21(1)(d). He was sentenced to five years of initial confinement and five years of extended supervision for count one, to be served concurrently with the sentence on count two, which was twelve years of initial confinement and five years of extended supervision. Lonkoski appealed the order denying his suppression motion.

¶19 In an unpublished per curiam decision, the court of appeals affirmed the conviction on different grounds than the circuit court. State v. Lonkoski, No. 2010AP2809-CR, unpublished slip op. (Wis. Ct. App. Jan. 18, 2012). The court of appeals assumed that Lonkoski was in custody at the point in question and focused on whether he reinitiated the conversation with the law enforcement officers. Id., ¶4. It found that Lonkoski validly reinitiated conversation, and therefore, the interrogation complied with Edwards. Id., ¶10.

¶20 Lonkoski petitioned this court for review, which we granted. We now affirm on the grounds that Lonkoski was not in custody when he initially stated he wanted an attorney, and therefore, Miranda and Edwards do not apply.

II.

¶21 When reviewing a circuit court's denial of a motion to suppress evidence, we apply a two-step standard. State v. Martin, 343 Wis. 2d 278, ¶28. We uphold the circuit court's

12

findings of fact unless they are clearly erroneous.  Id.  We then review de novo the application of the facts to the constitutional principles.  Id.

III.

¶22  The question we must answer in this case is whether the statements obtained from Lonkoski in the interviews were obtained in violation of his constitutional rights and must therefore be suppressed.  First, we must determine whether the statements were obtained in violation of Miranda because they were obtained after Lonkoski invoked his right to an attorney during a custodial interrogation.  If that is the case we must then consider whether Lonkoski reinitiated conversation with the detective such that those statements are admissible under Edwards notwithstanding the Miranda violation.  The threshold question to both of these arguments is whether Lonkoski was in custody when he stated that he wanted an attorney.

¶23  The Fifth Amendment to the United States Constitution states in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself."[8]  Courts have implemented procedural safeguards consistent with the Fifth Amendment.  One such safeguard, grounded in the United States Constitution, is found in Miranda.  Dickerson v. United States, 530 U.S. 428, 432 (2000) (holding that Miranda is a

---

[8] The Fifth Amendment has been applied to the states through the Fourteenth Amendment.  Malloy v. Hogan, 378 U.S. 1, 6 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States.").

13

constitutional decision which applies to both federal and state courts and cannot be overruled by legislative action). Miranda held that no one should be subjected to custodial interrogation until he or she is "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966). If someone is subjected to custodial interrogation without these warnings and makes incriminating statements, then those statements constitute a Miranda violation and cannot be used by the prosecution. Id. Custody is a necessary prerequisite to Miranda protections. State v. Armstrong, 223 Wis. 2d 331, 344-45; Montejo v. Louisiana, 556 U.S. 778, 795 (2009) ("If the defendant is not in custody then [Miranda and Edwards] do not apply; nor do they govern other, noninterrogative types of interactions between the defendant and the State.")

¶24 No one disputes that Lonkoski was interrogated, so the issue is whether he was in custody. If he was not in custody, then Lonkoski is not entitled to have his subsequent statements suppressed under the Miranda rule. See, e.g., State v. Hassel, 2005 WI App 80, ¶9, 280 Wis. 2d 637, 696 N.W.2d 270; see also, McNeil v. Wisconsin, 501 U.S. 171, n. 3 (1991) (stating, "We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than 'custodial interrogation' . . . . Most rights must be asserted when the government seeks to take the action they protect against.").

14

¶25 Lonkoski argues that because the interrogation had gotten to the point that the officers knew and could prove he was responsible for his child's death, no one would believe he was free to leave, and therefore, he was in custody. He further argues that even if he was not actually in custody, a person may invoke rights under Miranda "when custodial interrogation is imminent or impending."[9] Pet'r Br. at 13.

¶26 The State argues that Lonkoski was not in custody when he asked for an attorney because he came to the sheriff's department without being asked, the length of time from the beginning of the interview to when the circuit court found that he was arrested totaled about thirty minutes, and the detectives told Lonkoski several times that he was not under arrest. The State further disagrees with Lonkoski's argument that Miranda

---

[9] Lonkoski also argues that no valid reinitiation occurred under Edwards because the officers, not Lonkoski, reinitiated the conversation by failing to cease the interrogation. Lonkoski believes that Wood's response to Lonkoski's request for an attorney and question about whether he was under arrest, "You are now," was likely to elicit an incriminating response and was thereby the functional equivalent to questioning under Rhode Island v. Innis, 446 U.S. 291, 301 (1980) and State v. Hambly, 2008 WI 10, ¶46, 307 Wis. 2d 98, 745 N.W.2d 48.

The State argues that even if Lonkoski was in custody when he asked for an attorney, he reinitiated further conversation with the detectives consistent with Edwards, and therefore, his statements should not be suppressed.

As noted previously, because we hold that Lonkoski was not in custody, we need not reach the parties' arguments on whether he reinitiated conversation with the detectives such that his statements could be admitted under Edwards.

15

protections should apply when custody is "imminent," finding the premise unsupported by case law.

¶27 The important threshold determination we must make is whether Lonkoski was in custody when he stated he wanted an attorney. The test to determine custody is an objective one. State v. Koput, 142 Wis. 2d 370, 378-79, 418 N.W.2d 804 (1988). The inquiry is "whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest." State v. Leprich, 160 Wis. 2d 472, 477, 465 N.W.2d 844 (Ct. App. 1991) (citing New York v. Quarles, 467 U.S. 649, 655 (1984)). Stated another way, if "a reasonable person would not feel free to terminate the interview and leave the scene," then that person is in custody for Miranda purposes. State v. Martin, 343 Wis. 2d 278, ¶33. Courts also formulate the test as "whether a reasonable person in the suspect's position would have considered himself or herself to be in custody." State v. Goetz, 2001 WI App 294, ¶11, 249 Wis.2d 380, 638 N.W.2d 386.

¶28 The custody determination is made in the totality of the circumstances considering many factors. Martin, 343 Wis. 2d 278, ¶35. The factors include "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint" used by law enforcement. Id. As one factor in the totality of the circumstances, an interview that takes place in a law enforcement facility such as a sheriff's department, a police station, or a jail, may weigh toward the encounter being custodial, but that fact is not dispositive. See, e.g., State v. Grady, 2009 WI 47, ¶4-5, 317 Wis. 2d 344,

16

766 N.W.2d 729 (examining an undisputedly non-custodial interrogation that took place at a police station). When determining the degree of restraint, courts consider factors like "whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved." State v. Morgan, 2002 WI App 124, ¶12, 254 Wis. 2d 602, 648 N.W.2d 23.

¶29 The parties agree that Lonkoski was not in custody at the beginning of the interview. Because we are determining whether Lonkoski was in custody at the point when he stated he wanted an attorney, we look at the circumstances surrounding the interview to determine if he was in custody when he made that statement.

¶30 We will begin by looking at the totality of the circumstances, examining the facts surrounding the defendant's freedom to leave. The circuit court found that the area that Lonkoski was in was a "typical interrogation setting." The court stated that the area was "locked to ingress by individuals, but there [was] no indication that it was locked for egress. That is, that the defendant could simply walk out." The circuit court also found that although the door was closed during most the interview, "there were clearly times when the door was opened and he could in fact have walked out." Finally, the officers stated that Lonkoski was not under arrest and that they were not accusing him.

17

¶31 The purpose, place, and length of the interrogation also support the conclusion that Lonkoski was not in custody. Lonkoski came to the sheriff's department on his own volition, providing transportation for the child's mother, Bodoh. The location of the interview being the sheriff's department weighs toward a custodial situation, but that fact is not dispositive. Grady, 317 Wis. 2d 344, ¶4-5. An officer went to the waiting room where Lonkoski waited for Bodoh, and Lonkoski went to an interview room. The circuit court found that the officers asked Lonkoski "open ended questions" that "called for a narrative by him. They were not accusatory. They were not leading questions." The circuit court found that the length of the interrogation was "relatively short" before he asked for an attorney, after about 30 minutes. These facts indicate that Lonkoski was not in custody.

¶32 Like the other factors, the degree of restraint Lonkoski experienced also does not indicate a custodial situation. Two officers questioned Lonkoski. The door to the interview room was repeatedly used by the officers throughout the interview without a key. At one point when both officers were leaving the room, Gardner asked Lonkoski if he preferred the door open or closed to which Lonkoski responded, "Don't bother me." During the relevant portion of the interview, Lonkoski was not handcuffed, no weapons were drawn by the officers, and no frisk was performed. Morgan, 254 Wis. 2d 602, ¶12. The circuit court found that Lonkoski was not physically

18

restrained in any way. These factors indicate a lack of custody.

¶33 Lonkoski argues that once the officers zeroed in on him as a suspect, there was no way any reasonable person would have felt free to leave. He cites several cases from other jurisdictions that he believes support the proposition that a person's knowledge that officers suspect the person of a serious crime is a significant factor that weighs in favor of finding that the person was in custody.

¶34 Statements officers make to a suspect can be an indication of the presence or absence of custody. Stansbury v. California, 511 U.S. at 325 (finding relevant the views of the officers manifested to an individual that would affect how a reasonable person would perceive his or her situation). However, a suspect's belief that he or she is the main focus of an investigation is not determinative of custody. Id. The United States Supreme Court has rejected this theory. For example, the United States Supreme Court in Beckwith v. United States, 425 U.S. 341 (1976), dismissed a similar argument about the circumstances of a non-custodial interrogation transforming into custodial interrogation after the investigation focused on the suspect, stating, "[W]e are not impressed with this argument." Id. at 345 (citation omitted) (internal quotation marks omitted). The Court quoted from United States v. Caiello, 420 F.2d 471, 473 (2d Cir. 1969) which stated: "It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time

19

the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning." *Id.* at 346-47 (emphasis added).

¶35 In addition, we note that Lonkoski's standard would necessarily focus on the subjective beliefs of both police and the suspect. This is inconsistent with the objective test created for custody. *See, e.g.*, *Koput*, 142 Wis. 2d 370, 378-80, (explaining the objective standard used to determine custody as not considering the "unarticulated plan" of police or the subjective beliefs of the suspect who may know he was guilty and should be in custody); *see also*, *Stansbury v. California*, 511 U.S. at 326 (rejecting a California Supreme Court custody-analysis because it "regarded the officers' subjective beliefs regarding Stansbury's status as a suspect (or nonsuspect) as significant in and of themselves, rather than as relevant only to the extent they influenced the objective conditions surrounding his interrogation."). The totality of the circumstances test applied in our opinion today provides the appropriate framework to protect suspects in interrogations and to determine whether a suspect is in custody for purposes of *Miranda*. Lonkoski's argument to the contrary is unsupported by the controlling case law and the purpose behind *Miranda* protections.

¶36 Lonkoski also argues that even if he was not in custody when he asked for an attorney, he was undisputedly in custody a few seconds later when he was arrested, so *Miranda* protections should apply. He states that the policy

20

justification for the "imminent interrogation" rule in State v. Hambly, 2008 WI 10, ¶3, 307 Wis. 2d 98, 745 N.W.2d 48, "applies with equal force whether the missing element [of custodial interrogation] is interrogation or custody." Pet'r Br. at 21. He also argues that if this were not the rule, then officers could overcome an assertion of rights by immediately arresting a person and continuing the interrogation. We disagree.

¶37 The policy justification in Hambly does not apply here. In State v. Hambly, we held that Miranda was properly invoked before a suspect was interrogated when the suspect had been formally arrested and asked for an attorney. 307 Wis. 2d 98. The suspect in Hambly had repeatedly refused to speak with law enforcement voluntarily; after his refusal, the officers formally arrested him and placed him in the back of the squad car; as he was escorted to the car, he stated that he wanted an attorney. Id., ¶7-9. The suspect was not being interrogated at the time he asked for an attorney. Id., ¶3. This court held: "a suspect in custody may request counsel and effectively invoke the Fifth Amendment Miranda right to counsel when faced with 'impending interrogation' or when interrogation is 'imminent' and the request for counsel is for the assistance of counsel during interrogation." Id., ¶24.[10] The court reasoned that the

---

[10] In Hambly, the court was divided on "whether to adopt a temporal standard to determine whether a suspect in custody has effectively invoked his or her Fifth Amendment Miranda right to counsel." State v. Hambly, 307 Wis. 2d 98, ¶4. The question of whether to adopt a temporal standard is not relevant to the analysis of Hambly set forth in this opinion and therefore is not discussed.

case illustrated the "type of coercive atmosphere that generates the need for application of the Edwards rule." Id., ¶44 (quoting United States v. Kelsey, 951 F.2d 1196, 1199 (10th Cir. 1991)).

¶38 Lonkoski believes that "imminent interrogation" and "imminent custody" are equally coercive and that this court should extend its holding in Hambly to the inverse situation where a suspect is being interrogated but is not yet in custody. This argument ignores the differences in the circumstances in each situation. In Hambly, the suspect was enduring a much more coercive environment than Lonkoski, who was talking to law enforcement officers while he was not yet in custody. Before a suspect is in custody, the coerciveness is substantially lessened because a reasonable person in the suspect's position would believe that he or she could end the conversation and leave at any time. See, Martin, 343 Wis. 2d 278, ¶33 (holding that custody exists when a reasonable person would believe that he could not end the conversation and leave).

¶39 Another reason the "imminent custody" rule that Lonkoski proposes is unnecessary is that the current definition of "custody" encompasses both formal arrest and situations in which a reasonable person would consider himself or herself in custody. See, e.g., Stansbury v. California, 511 U.S. at 322. By contemplating both, the current test prevents law enforcement from gaming the system by placing a suspect in a custodial-like situation without formally arresting the person to avoid Miranda

22

protections. We therefore see no reason to adopt a new test to fit the facts of this case.

¶40 We also reject Lonkoski's implication that the officers can override an assertion of Fifth Amendment rights by immediately arresting a suspect. First, warrantless arrests require probable cause so law enforcement officers can arrest only suspects they have probable cause to arrest. See, e.g., State v. Lange, 2009 WI 49, ¶19, 317 Wis. 2d 383, 766 N.W.2d 551 ("A warrantless arrest is not lawful except when supported by probable cause."). Law enforcement officers do not necessarily have probable cause to arrest everyone who agrees to talk with them. Second, upon arrest, law enforcement must give the warnings described in Miranda. Lonkoski dismisses this important step by stating, "the person could hardly be expected to believe that he or she truly had the right to counsel at this point; after all, he or she has just asked for a lawyer and had the request denied."[11] Pet'r Br. at 22. We disagree that providing Miranda warnings to suspects provides them no protection. The contents of Miranda warnings provide significant information about a person's rights and require the person to waive those rights before admissible statements can be

---

[11] We note that there is no evidence Lonkoski ever "asked for a lawyer and had that request denied"——as explained above, within moments of stating he wanted a lawyer, Lonkoski made clear that he no longer wanted a lawyer and he wished to speak with the officers.

elicited by law enforcement.[12]   Therefore, our decision does not, as Lonkoski's argument suggests, give law enforcement free rein to ignore valid assertions of the right to counsel.

¶41 We conclude that Lonkoski was not in custody when he asked for an attorney.  Because his statement about wanting an attorney was not made during a custodial interrogation, Miranda's rule requiring that the interrogation cease upon a request for an attorney does not apply, and there is no constitutional violation and no bar to using his subsequent statements.   As noted previously, this holding makes it unnecessary for us to reach the issue of reinitiation under Edwards because "[i]n every case involving Edwards, the courts must determine whether the suspect was in custody when he requested counsel and when he later made the statements he seeks to suppress."  Maryland v. Shatzer, 559 U.S. __, 130 S. Ct. 1213, 1223 (2010) (emphasis added).

IV.

¶42 We hold that the motion to suppress was properly denied because Lonkoski was not in custody when he asked for an attorney, and therefore, Miranda did not bar further interrogation by the officers.

¶43 A person is in "custody" if under the totality of the circumstances "a reasonable person would not feel free to

---

[12] To be adequate Miranda warnings, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Miranda v. Arizona, 384 U.S. at 445.

terminate the interview and leave the scene." State v. Martin, 343 Wis. 2d 278, ¶33. "[A] court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. at 322 (citations omitted) (internal quotation marks omitted). Several factors have been considered relevant in the totality of the circumstances such as "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint." Martin, 343 Wis. 2d 278, ¶35.

¶44 Lonkoski came to the sheriff's department without being asked and voluntarily submitted to questioning by law enforcement officers. Although he was questioned in a small room within a jail by two officers with the door closed, the circuit court found that it was a typical interrogation setting locked to ingress by individuals but not for egress; he was never restrained in any way; and the door was opened more than once by people entering or exiting. In fact, on one occasion when the officers left the room, one of the officers asked Lonkoski whether he preferred the door to the interrogation room to be open or shut. Furthermore, Lonkoski was told that he was not under arrest and that the officers were not accusing him. In the totality of the circumstances, a reasonable person in Lonkoski's position at the time he stated he wanted an attorney would believe that he or she was "free to terminate the interview and leave the scene." We decline to adopt Lonkoski's

25

argument that <u>Miranda</u> applies when custody is "imminent." Accordingly, although our analysis differs from that of the court of appeals, we affirm its decision.

*By the Court.*—The decision of the court of appeals is affirmed.