COURT OF APPEALS
DECISION
DATED AND FILED

March 22, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP687-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF800

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CORY D. LYONS,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Winnebago County: BARBARA H. KEY, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Cory D. Lyons appeals a judgment of conviction for first-degree reckless homicide of his infant son, Oliver.[1]   Lyons argues the circuit court erred by denying his motion to suppress incriminating statements he made to law enforcement.   We reject Lyons' arguments and affirm.

## BACKGROUND

¶2    Oliver's mother, Kandice Diaz, left seven-week-old Oliver in her husband Lyons' care on her first day back to work following Oliver's birth.   Lyons called Diaz while she was at work and reported Oliver's breathing was not right and she needed to come home.   Diaz returned immediately and observed Oliver was limp, colorless, and making intermittent gasping sounds.   Lyons told her Oliver was choking.   Diaz called 911.

¶3    At a hospital in Oshkosh, Lyons admitted to law enforcement that he became frustrated with Oliver's crying and shook his baby in a manner that caused Oliver's head to snap back and forth approximately five to six times.   A CT scan revealed Oliver had significant subarachnoid hemorrhages (brain bleeding).   While medical staff were preparing Oliver for transport to Children's Hospital of Wisconsin, Oliver went into respiratory failure and died.   The attending emergency room physician opined Lyons' shaking of Oliver likely resulted in the subarachnoid hemorrhages seen on the CT scan, which subsequently led to the baby's death.

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use a pseudonym when referring to the victim in this case.  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶4     Lyons pled no contest to first-degree reckless homicide of Oliver. Before pleading, Lyons moved to suppress two sets of incriminating statements regarding shaking Oliver that he made to law enforcement. Lyons argued that at the time he made the first set of statements regarding shaking Oliver, he was "in custody" for purposes of *Miranda*[2] and had not first been advised of his *Miranda* rights. He also argued the statements were involuntary because officers exerted "coercive pressure" to induce him to make the statements. Lyons made the second set of incriminating statements regarding Oliver after he was arrested, read his *Miranda* rights, and waived them. He argued these statements needed to be suppressed as improper derivative evidence.

¶5     At the suppression hearing, officer Nathan Defatte testified that on November 29, 2018 dispatch received a 911 call from Diaz, stating Oliver was not breathing and they were headed to the hospital. Defatte intercepted the vehicle while en route to the hospital. Lyons advised Oliver was choking, and Defatte began providing emergency medical care. Officer Keith Norkofski arrived on scene to assist. Emergency medical responders then arrived on scene and transported Oliver by ambulance to the hospital.

¶6     Per Oshkosh police department protocol, whenever there is a death or significant injury in a vehicle, the department holds the vehicle for further investigation. Accordingly, Norkofski transported Diaz to the hospital in his squad car. Officer Grant Wilson, who was in uniform with his gun, transported Lyons to the hospital in his squad car. Lyons was not under arrest, was not told he

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

was under arrest, or handcuffed. Lyons rode in the back of Wilson's squad car. Wilson had to open the door to let Lyons in and out.

¶7 Norkofski and Diaz arrived at the back entrance of the hospital and entered through the ambulance bay doors. They were directed to the main waiting room; however, because there were other people in the main waiting room, they went into the family grief room. Wilson and Lyons arrived at the hospital around the same time. When Wilson and Lyons arrived, they went through the main entrance of the hospital to the grief room.

¶8 The grief room has two doors—one door connects to the public lobby, the other door connects directly to the emergency room. Both doors in the grief room are unlocked for people inside the room. The door from the public lobby to the grief room is locked to enter so that grieving families do not have interruptions from people in the lobby.

¶9 When Lyons and Wilson entered the grief room, Diaz, Norkofski, and a hospital chaplain were already inside. Diaz's mother arrived with another family member and joined them in the room. Hospital medical staff were also in and out of the room, giving updates on Oliver's condition. Wilson explained that when a child is seriously injured, department protocol requires an officer to stay with the parents until detectives arrive. Wilson stayed with Lyons, and Norkofski stayed with Diaz.

¶10 At one point, medical staff arrived to take Lyons and Diaz back to see Oliver. Lyons never asked either officer permission to leave and no one made any attempts to stop him. Norkofski went back into the emergency room with them. At another point, Lyons and Diaz went outside to smoke a cigarette. Lyons did not ask permission to leave and Wilson made no attempt to stop him. Wilson

testified they walked through the public lobby to outside the emergency room entrance. Lyons still had his cell phone and cigarettes. When Lyons finished his cigarette, he walked back into the hospital and did not acknowledge Wilson as he walked inside. On one occasion, when Diaz was talking to Norkofski to give further details on the incident, Lyons asked to be with Diaz and Wilson told him not right now.

¶11 Detectives Dean Artus and April Hinke arrived at the hospital approximately one hour after Lyons, Diaz, Wilson, and Norkofski. Upon arrival, Artus and Hinke spoke briefly with the attending emergency room physician. The doctor stated medical staff did not know what was going on with Oliver, the baby was currently in testing, and, to aid in treating the baby, medical staff needed more information as to what caused Oliver to stop breathing and lose his pulse.

¶12 Artus went to the grief room and Lyons was seated inside with Wilson and the hospital chaplain. At that time, Diaz was with Hinke and Norkofski in the public lobby. Artus recorded his interaction with Lyons and the recording was transcribed for the court. When Artus entered the grief room, he introduced himself and advised Lyons that he had spoken with the doctor and the doctor wanted Artus to get the full story again from the start. Lyons told Artus that Oliver was crying and Lyons tried feeding him, burping him, and changing his diaper, but Oliver continued to cry. Lyons put Oliver down, left to go make another bottle, the dogs were running around and jumping near Oliver, Oliver started screaming, Lyons gave Oliver his bottle and left to put the dogs in the bedroom, and when he came back, Oliver was choking. Lyons tried to get Oliver to breathe again and called Diaz. Artus directed Wilson to go relay that information to the doctor.

5

¶13 Artus told Lyons they just went through a very quick version and now they needed to go through a long history. At the suppression hearing, Artus explained that when he investigates a significant injury or death of an infant, he goes through a standard form, titled, "Sudden Unexplained Infant Death Investigation." The form includes a wide range of questions that covers any possible medical or other issue causing the child's injury or death. It includes questions related to feeding, diapering, medical issues, birth or pregnancy complications, well baby visits, etc. Artus explained to Lyons this would take a bit of time to go through.

¶14 Lyons asked Artus, "Is there any chance I could smoke a cigarette before you start this to try to calm down a little bit? Maybe you can come outside with me and do it outside with me for all I care." Artus responded, "In a little bit." Artus then began asking Lyons questions such as when Oliver was born, whether there were any complications, whether Oliver had any health complications, who was his pediatrician, and whether Oliver had been attending his well baby visits. Artus told Lyons he was going to ask really in-depth questions about what happened that evening, going step by step. During this questioning, Artus took a break to consult with Hinke and Lyons asked, "Go outside with me, please?" Artus told Lyons that when he was back they would go outside for a cigarette break.

¶15 When Artus went outside to talk to Hinke, Artus also had a conversation with the emergency room doctor. The doctor told Artus a CT scan had been completed, Oliver had a brain bleed, and the doctor did not believe Lyons' version of what happened because Oliver's brain bleed was more substantial than Lyons' explanation.

¶16    Artus and Lyons went outside for a cigarette break. Lyons asked whether Diaz wanted a cigarette, too, and Artus told Lyons that "she's going to be with Detective Hinke for a little bit." During the cigarette break, Artus made "small talk" with Hinke. They talked about Lyons' family, other kids, and job. When they got back inside the grief room, Artus advised Lyons that he had talked to the doctor and

> I think we're missing something based upon some issues that your child has. I think something more happened real close in when he stopped breathing correctly and I got to know what that is so that they can help him…. He's got a pretty severe brain injury.

Oliver would be transported to Children's Hospital of Wisconsin in Milwaukee for emergency care.

¶17    Hinke joined Artus, Wilson, and Lyons in the grief room. The detectives reviewed Lyons' version of events again. This time Lyons added that when Oliver started choking, he picked him up and put him on the floor in an attempt to get him to breathe again. Lyons speculated that perhaps he injured the back of Oliver's head on the floor because he had been panicking that Oliver was choking. The following exchange took place:

> [Artus]. [Lyons], you're not understanding this right. Your child has a brain injury which causes him to not breathe. By the time you get to not breathing the brain injury's already happened. His brain injury is what's causing him to not breathe. Get that?
>
>    So when you're trying to get him to breathe …
>
> [Lyons]. How do you know he wasn't choking prior?
>
> [Artus]. No, there's no choking here. Your son has a major brain injury that's causing him to not breathe. I've explained this. Get this in your head, this is the fact. Okay. So you got to come up with something different.

7

> Your baby once it's not breathing well has a severe brain injury already, and this is fairly quickly that this happens, so you need to tell us.

¶18     Lyons then stated he dropped Oliver. The dogs were jumping around and he picked Oliver up and dropped him. When asked why he had not said anything about dropping Oliver before, Lyons stated he was afraid Diaz would yell at him. Hinke responded:

> I mean, that's about the most selfish thing I think I have ever heard in my life. It's ridiculous. You don't tell your wife that you dropped the child and you let her play—you played this game for the last, what is it, like 9:30 now, two and a half hours, we've been sitting here and your child is in there. Dude.

Detectives implored Lyons to tell them what happened:

> [Artus]: Your son is on the way to Milwaukee right now. I can call down there and beat him down there with a phone call and tell them. They will be on him like that treating him for the exact injury he has versus trying to figure out for the next three hours what is wrong with him.
>
>      ….
>
> [Hinke]: Dude, this is fixable, this is fixable, but if you keep this shit up where they can't help your son and he dies it's not quite as fixable.

¶19     Lyons told detectives that when he dropped Oliver, Oliver bounced off several objects before eventually hitting the floor. Artus responded:

> And I'm going to tell you straight up, man to man, again, because that's the way I am, is truth up front. If your kid's bouncing off the couch, bouncing off this, bouncing off that, doesn't have the brain injury he's got right now. Your child, I'm guessing, is going to be by a doctor saying that he fell three floors to get this injury, three stories to get this injury or more.
>
>      ….

8

> This is why you need to become a man and tell the truth about what happened to your son. This crap about bouncing here and there, no. Every minute or two we get a little more; I slammed him on the floor; well, he fell, he fell; he bounced off four different things before he hit the floor. Come on, man. Just be a man and say what you did.

¶20 Upon further questioning, Lyons admitted to officers that he was frustrated with Oliver's crying, picked him up, shook him one time, yelled at him to stop screaming, put him down and went to get a bottle. Lyons stated, "That's not going to []cause a brain injury because that's not enough of a shake." Hinke asked Lyons why he previously omitted telling them he shook Oliver if he was not worried it caused an injury. Lyons replied, "Because I'm afraid that you guys are going to take me to jail for accidentally hurting my child." Hinke responded, "I think you should be more worried about whether or not your son is going to live or die …." She continued:

> Because what you're talking about can be dealt with later. Okay. What you're talking about can be dealt with a lot of different ways. Okay. But your kid's only got one chance to make it tonight, and that's with the best doctor's care. But instead you're fucking around with four or five different stories piecing it together, trying to figure out what injuries he's going to have, what story you can tell that's going to fit it.

¶21 Lyons then told detectives that, after Diaz left for work, Oliver started crying. Lyons initially let Oliver cry it out. When Oliver did not stop, Lyons picked Oliver up, shook him one time, and yelled at him to stop crying. When Oliver did not stop crying, Lyons was "pissed" and not gentle. He picked Oliver up and moved him around the room, grabbing and jerking him five or six times and not supporting his head. Lyons also dropped Oliver, picked him up by his leg and back one or two times, and squeezed his ribcage.

¶22    The interview was eventually interrupted because Diaz was going down to Milwaukee with her mom.  Lyons asked Artus if he was going to jail, and Artus responded he did not know yet.  Lyons told Artus he wanted to get down to Milwaukee, "I want to go to my son.  I want to make sure that I didn't kill him."  Artus responded, "I don't think you meant to do this."

¶23    Lyons pulled out his cell phone and Wilson told him, "You want to stay off of that for right now."  Artus asked Lyons if they could search his house to see the layout and the scene as described by Lyons.  Lyons agreed.  Lyons asked Artus about the location of his vehicle, and Artus responded he did not know but he would find out for Lyons.  Lyons again asked Artus if he was going to jail, and Artus responded, "It's a very tough situation for you and us."  Artus' interview with Lyons was two hours and nineteen minutes.

¶24    Lyons went outside with Wilson for a cigarette.  Before they left, Hinke advised Lyons that Diaz might be outside and Lyons should not talk to her right now.  Wilson testified Lyons was not under arrest at this time and Lyons still had possession of his cell phone and cigarettes.  Wilson then transported Lyons to Lyons' house.  Lyons was not in handcuffs and at his house he freely walked around.  Wilson then drove him to the police station.

¶25    At the police station, Lyons asked if he was under arrest.  Artus responded, "Yeah, I think you're going to end up going to jail today."  Artus read Lyons his *Miranda* rights and filled out a department *Miranda* form.  After Lyons waived his *Miranda* rights, Lyons admitted to jerking Oliver several times to the point the baby's head snapped back.

¶26    Following post-suppression hearing briefing, the circuit court denied Lyons' suppression motion.  The court found Lyons was not "in custody" for

*Miranda* purposes until he was at the police station. The court explained that from the initial stop to the transport to the hospital, to the time at the hospital to the transport to the house, to the time at the house, and then to the transport to the police station, Lyons was free to come and go. Lyons was not told he could not go anywhere and he was not handcuffed. Although law enforcement advised Lyons he had to wait for a cigarette break, they were in the middle of questioning to determine the nature of what occurred in an attempt to treat Oliver. The tone of the questioning was not confrontational and Lyons was allowed to check his phone and have it with him at all times. The court reasoned that, if Lyons had been in custody, he would not have been free to come and go and his movements would have been controlled, which did not occur here. Once Lyons was in custody at the police station, police complied with *Miranda*.

¶27 As to voluntariness, the court observed it needed to balance Lyons' personal characteristics against the police pressure applied under the totality of the circumstances. The court found Lyons knew he was not under arrest, understood he was not under arrest, and had previous experience being taken into custody by police. There were no threats or promises made. Although there was pressure placed on Lyons, this pressure was not unduly coercive and it was caused by detectives trying to determine what actually happened when Lyons' depiction of events changed. Additionally, Artus telling Lyons he did not believe him and wanted Lyons to tell the truth was not unduly coercive. The Court determined Lyons' "statements themselves were voluntary products of his free will[.]"

¶28 Lyons appeals. Additional facts will be included below.

11

## DISCUSSION

¶29 "When reviewing a circuit court's denial of a motion to suppress evidence, we apply a two-step standard." *State v. Lonkoski*, 2013 WI 30, ¶21, 346 Wis. 2d 523, 828 N.W.2d 552. "We uphold the circuit court's findings of fact unless they are clearly erroneous." *Id.* "We then review de novo the application of the facts to the constitutional principles." *Id.*

### I. "In custody" for purposes of *Miranda*

¶30 Lyons first argues the circuit court erred by denying his suppression motion because, at the time he made the incriminating statements, he was "in custody" for purposes of *Miranda* and he had not been given his *Miranda* warnings. "[N]o one should be subjected to custodial interrogation until he or she is 'warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Id.*, ¶23 (quoting *Miranda*, 384 U.S. at 444). "If someone is subjected to custodial interrogation without these warnings and makes incriminating statements, then those statements constitute a *Miranda* violation and cannot be used by the prosecution." *Id.* "Custody is a necessary prerequisite to *Miranda* protections." *Id.*

¶31 "The test to determine custody is an objective one." *Id.*, ¶27. "The inquiry is 'whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest.'" *Id.* (citation omitted). "Stated another way, if 'a reasonable person would not feel free to terminate the interview and leave the scene,' then that person is in custody for *Miranda* purposes." *Id.* (citation omitted). "Courts also formulate the test as 'whether a reasonable person

in the suspect's position would have considered himself or herself to be in custody.'" *Id.* (citation omitted).

¶32   "The custody determination is made in the totality of the circumstances considering many factors." *Id*., ¶28.  "The factors include 'the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint' used by law enforcement." *Id.*  "As one factor in the totality of the circumstances, an interview that takes place in a law enforcement facility such as a sheriff's department, a police station, or a jail, may weigh toward the encounter being custodial, but that fact is not dispositive." *Id.*  "When determining the degree of restraint, courts consider factors like 'whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved.'" *Id.* (citation omitted).

¶33   Lyons asserts the circuit court overlooked specific facts from its determination and these facts weigh in favor of suppression.  Lyons argues the circuit court did not consider he was transported by an armed, uniformed officer to the hospital in the back of a locked squad car, that officers denied two of Lyons' requests to leave the room for a cigarette break, and that Wilson told Lyons to stay off his phone and put it away.  According to Lyons, the court also failed to consider the interview was nearly two-hours-and-twenty-minutes in length, conducted in a private room that was locked from the outside in the presence of three police officers.  Lyons emphasizes the circuit court failed to consider law enforcement had conveyed their belief that Lyons committed a serious offense and that Lyons asked whether he was going to jail.  Lyons argues these omitted facts

establish that he was in custody for *Miranda* purposes when he made the incriminating statements at the hospital.

¶34    We disagree.  First, some of the facts Lyons argues to assert he was in custody occurred *after* he made the incriminating statements at the hospital.  For example, Wilson directed Lyons to stay off his phone and Lyons asked Artus if he was going to jail *after* Lyons relayed to Artus that he was "pissed" Oliver would not stop crying, shook Oliver, grabbed and jerked him five or six times, dropped Oliver, picked him up by his leg and back one or two times, and squeezed his ribcage.

¶35    As for Lyons' other contentions, given the totality of the circumstances, a reasonable person would not have believed, at the time the incriminating statements were made, that he was in custody.  Department protocol required freezing the traffic scene and officers transported both Lyons and Diaz to the hospital to be with Oliver.  While in the squad car, he was not restrained, told he was under arrest, or handcuffed.  Neither officer drew a weapon.  When Lyons arrived at the hospital, given the seriousness of Oliver's condition, he was taken to the hospital's grief room.  Egress from grief room was unlocked; Lyons could leave at any time.  Indeed, he did leave when he followed medical personal into the emergency room to see Oliver without permission.  He also went outside, smoked cigarettes and looked on his cell phone at the hospital.  At various times, the individuals inside the grief room included the officers and detectives, a hospital chaplain, Diaz and her family members, Lyons, and medical staff.

¶36    There was no formal arrest or restraint on Lyons' freedom of movement similar to that of an arrest.  He maintained possession of his cell phone and cigarettes.  When questioned by Artus and Hintz, he was in the emergency

room's grief room—not a squad car or police station. As for the delay in taking cigarette breaks, the circuit court found the delay was because detectives were trying to figure out what happened to Oliver so Oliver could receive appropriate medical care. At no point did Lyons ask to leave the room or terminate questioning. He was never restrained or handcuffed. The court found the detectives' tone when asking questions was not confrontational. The interview was over two hours but there was a cigarette break and detectives were in and out of the room. Officers never prevented Lyons from leaving. A reasonable person would have felt free to leave the grief room and terminate the interview.

## II.    Voluntariness of the Statements

¶37    Lyons next argues the statements should be suppressed on the basis that they were involuntary. "A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *State v. Lemoine*, 2013 WI 5, ¶17, 345 Wis. 2d 171, 827 N.W.2d 589 (citation omitted).

¶38    "We make the determination in light of all of the facts surrounding the interview and decided under the totality of the circumstances, balancing the defendant's relevant personal characteristics with the pressures imposed by the police." *Id.*, ¶18.

> The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. The personal characteristics are balanced against the police pressures and tactics which were used to induce the statements, such as: the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any

> excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*Id.* (citation omitted).

¶39    Lyons argues his statements were involuntary because law enforcement exploited both the crisis and Lyons' fears regarding Oliver and, "[u]nder the circumstances, this was coercive." We disagree.

¶40    Under the totality of the circumstances, Lyons' statements were voluntary. At the time of the interview, Lyons was twenty-seven years old, had completed the 11th grade and obtained a HSED. Artus testified that during the interview Lyons appeared to be of average intelligence and displayed no abnormal physical traits or impaired conditions. The circuit court found Lyons had ample familiarity interacting with law enforcement, knew he was not under arrest, and agreed to speak.

¶41    There is also no evidence of police coercion. Detectives did not threaten Lyons with any type of physical violence or make any promises to Lyons in exchange for his cooperation. Lyons had a cigarette break during the interview with Artus and he maintained possession of his cell phone. Although the court found "Detective Artus was beginning to indicate he wasn't believing it and he wanted [Lyons] to tell the truth," the court determined this was not "undue coercion." *See State v. Owen*, 202 Wis. 2d 620, 642, 551 N.W.2d 50 (Ct. App. 1996) (Accusing a suspect of lying is not an improper police tactic). Additionally, that detectives implored Lyons to state what happened to Oliver so that the baby could get appropriate medical care did not amount to undue coercion. Lyons' decision to make incriminating statements was the result of "a free and

16

unconstrained will, reflecting deliberateness of choice[.]"  *See **Lemoine***, 345 Wis. 2d 171, ¶17.

### III.    Subsequent police station admissions

¶42    Later that night Lyons was arrested at the police station, advised of his ***Miranda*** rights, waived them, and then repeated his incriminating statements. Lyons argues these subsequent statements must also be suppressed based on ***Missouri v. Seibert***, 542 U.S. 600 (2004).  In ***Seibert***, the Court considered "a police protocol for custodial interrogation that calls for giving no [***Miranda***] warnings ... until [the] interrogation has produced a confession."  *Id.* at 604.  The Court noted that ***Miranda*** warnings, "inserted in the midst of coordinated and continuing interrogation, ... are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'"  *Id.* at 613-14 (citation omitted; alteration in original).  The Court held Seibert's post-warning statements were inadmissible. *Id.* at 617.

¶43    Lyons' argument, however, assumes that we concluded Lyons was in custody for ***Miranda*** purposes while he was talking to officers in the hospital grief room and that his previous statements were involuntary.  Here, by contrast, Lyons was not in custody for ***Miranda*** purposes when he made his initial incriminating statements to officers in the grief room and his statements were voluntary.  At the police station, Lyons was advised of his ***Miranda*** rights, waived them, and continued to talk.  Lyons' second set of incriminating statements are not inadmissible under ***Seibert***.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.