COURT OF APPEALS
DECISION
DATED AND FILED

August 8, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1581-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF15

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

RICHARD W. SEEHAVER,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dunn County: ROD W. SMELTZER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Richard Seehaver appeals from a judgment of conviction, which was entered following his no-contest plea to second-degree

intentional homicide by use of a dangerous weapon, as a repeater. Seehaver contends that the circuit court erred when it denied his motion to suppress statements made to investigators following his arrest. Specifically, Seehaver argues that the court erred because he was not given *Miranda* warnings until partway through a custodial interrogation. *See* ***Miranda v. Arizona***, 384 U.S. 436 (1966). Additionally, he asserts that he did not knowingly and intelligently waive his rights once the *Miranda* warnings were provided. We affirm Seehaver's judgment of conviction.

## BACKGROUND

¶2      Seehaver was charged with first-degree intentional homicide by use of a dangerous weapon, as an act of domestic abuse and as a repeater, for murdering his roommate, John Likeness. According to the criminal complaint, officers responded to a reported altercation at Seehaver and Likeness's residence. Upon arriving at the residence, an officer walked up to the front door, looked inside a window, and observed Likeness sitting in a "[L]azy [B]oy chair" with Seehaver's "arms wrapped around Likeness'[s] neck."

¶3      After unsuccessfully trying to make contact with Seehaver and Likeness at the front door, the officer went back to the window and peered inside. At this point, "he observed an item sticking out of Likeness'[s] chest," which was later determined to be an arrow. Seehaver eventually exited the house and was detained by law enforcement. An autopsy was performed on Likeness, which showed that he sustained an arrow wound to the chest and three "sharp force injuries to the neck."

¶4      After a complaint was filed, the circuit court ordered a competency evaluation of Seehaver. Thereafter, the court found Seehaver incompetent to

2

proceed but determined that he would likely become competent within the statutory time period if given the appropriate medication and treatment. Roughly three months later, a doctor informed the court that Seehaver no longer lacked the "substantial mental capacity to understand the proceedings and assist in his own defense." Following the doctor's recommendation, the court found Seehaver competent to proceed.

¶5 Subsequently, Seehaver filed a motion to suppress statements he made to investigators Kelly Pollock and Michael Sampson after being taken into custody. He argued that the investigators did not provide him *Miranda* warnings "until partway through the interrogation" and that his statements "were not voluntary, knowing and/or intelligent."

¶6 At a suppression hearing, the circuit court admitted an audiovisual recording and a transcript of the investigators' interview with Seehaver into evidence. The interview, which commenced just before midnight the same day Seehaver was taken into custody and was in the "recorded interview room" at the Dunn County Jail, began as follows[1]:

> SAMPSON: Hey, Richard. How are you? Been a long time since I last saw you. Want something to drink? Your choice.
>
> SEEHAVER: Yeah.
>
> POLLOCK: Good choice.
>
> SAMPSON: Good choice. I was really holding out for this one.

---

[1] Because the parties agree that the admitted transcript included multiple errors, we rely largely on the actual audiovisual recording in this opinion.

POLLOCK: I was waiting for you to be like I got the Dr. Pepper, I got the Dr. Pepper.

SAMPSON: I told her on the way over here I was really hoping to get the Dr. Pepper.

SEEHAVER: Where have I seen you before?

SAMPSON: Um, I talked to you … over at the house there … on Veteran's Day. Remember that? Remember you guys had a girl that came over and stayed with [you]? She was from like … Hayward.

SEEHAVER: Yeah.

SAMPSON: Like drinking. You and I had a really—really good conversation that day. Remember that?

SEEHAVER: I do, yeah.

SAMPSON: Yeah. So yeah. It's been a little bit. I transitioned obviously in the meantime I moved out of … patrol and now I'm an investigator. So.

POLLOCK: And my name is Kelly, I'm another investigator with the police department. And what do you like to be called? What do you like to go by?

SEEHAVER: Rich is fine.

POLLOCK: Rich is fine? Okay. Sounds good, Rich. Um, so is there anything else we can get you right now or are you doing okay?

SEEHAVER: I'm—there's nothing you can do for me.

POLLOCK: Okay. Um, can you tell me a little bit about yourself?

SEEHAVER: Um. Mhm. Oh. I care about people. I'm kind. And I'm—I care for a good friend.

POLLOCK: Can you tell me how long, Rich, how long have you lived here?

SEEHAVER: Wisconsin?

POLLOCK: Yeah. In this city particularly.

SEEHAVER: Oh. At John and I's house?

POLLOCK:  Mhmm.

SEEHAVER:  Couple months.

POLLOCK:  Couple months.  Okay.

SEEHAVER:  We moved—We lived in Cedar Falls before there.

POLLOCK: Okay.  Have you lived anywhere between Cedar Falls and here?

SEEHAVER: If this fucking bullshit don't get over tonight, I'm gonna—I'm gonna fucking kill myself.  I mean it.  I'm fucking sick of it.  People have been fucking with me for a long—years.  Years and years this shit has been going on. Fucking with me. Picking on my fucking friends and I'm done.  I'm done.  Picking on people that are—

POLLOCK:  So.

SEEHAVER:  I'm—I'm no frickin angel.

POLLOCK: Okay.  So, Rich, you lived in Menomonie here for a couple months now?

SEEHAVER:  Yep.

POLLOCK: Okay.  Um, who lives with you?  Or do you know—do you know your address here in town?

SEEHAVER: You know, right now if I wanted to deal with the—if I wanted to do what the devils been telling me to do, I would shut my fucking mouth and I'd say lawyer up.  I—and I—ask to get out of here and go back to my cell.  I don't think that's the right thing to do though.

POLLOCK:  Okay.

SAMPSON: Rich, you remember having a conversation with me back in November?

SEEHAVER:  I don't remember what it was about exactly but—

SAMPSON:  Okay.

5

¶7      At that point in the interview, Seehaver began a roughly seven-minute, uninterrupted monologue about the devil, aliens, and how someone was talking through the radio and television for Seehaver "to come join them." He also stated that he had been diagnosed with schizophrenia. During this discussion, Seehaver also mentioned a "large group" who was going to kill him for not assisting "in child slavery, rape, [and] murder."

¶8      Investigator Sampson then asked Seehaver for the name of the group Seehaver mentioned, to which Seehaver responded, "probably [the] Aryan Brotherhood." Seehaver accused both investigators of being part of the group, but he then quickly changed the subject and asked Sampson what they talked about during their previous conversation. Sampson responded that they talked about how they were both veterans.

¶9      Seehaver then commenced another largely uninterrupted monologue lasting roughly twelve minutes. This time, he also discussed how the group "picked on [his] friend for a long time," who was later revealed to be Likeness. Seehaver stated that his "best friend had been tortured for so long. He's better off dead." During the same monologue, Seehaver said that he "didn't kill John out of, uh—he was fucking miserable and did some of the most terriblest [sic], most heinous fucking things."

¶10      Roughly two minutes after making this latter statement, the following occurred:

> POLLOCK: Do you think, Rich, we could talk a little bit more about what John's role was with these people and what they made him do and what they did to you? Would that be okay with you?
>
> SEEHAVER: Yeah.

6

POLLOCK: Okay. Can I read something to you quick?

SEEHAVER: Sure.

POLLOCK: Okay. [Read *Miranda* warnings.] Do you understand your rights?

SEEHAVER: Oh, yes, I do.

POLLOCK: Are you willing to talk to me a little bit more about what's going on?

SEEHAVER: Hmm. No. I—I want you fuckers to kill me. Go ahead. Kill me.

POLLOCK: We don't want to kill you. We just want to talk about you, about what happened.

SEEHAVER: Don't bull fucking shit me. I don't believe either fucking one of you…. You're probably fucking both of them too. Fucking—you give me the gun and I'll fucking shoot myself. Leave me the fuck alone…. I'm not putting up with you motherfuckers anymore. I'm good. You've done diggity fucking—I'm not—this is not going to be a partnership. I wouldn't partnership [sic] with such fucking bullshit.

POLLOCK: Well, I would like to hear a little bit more, Rich, about what John's role was with the people and what they did for you and to you …, but I've got to know if you're willing to answer questions and talk to us and make a statement right now and it's pretty much just a yes or no.

Seehaver then went on another, uninterrupted monologue about the group and his daughter. He also stated that "[e]verything I've learned has told me if you want to get out [of] something, shut your fucking mouth. I know this." Pollock again asked Seehaver if he would be willing to talk to the investigators. Although Seehaver did not give a "yes" or "no" answer, he continued talking with the investigators.

7

¶11    Ultimately, Seehaver admitted to murdering Likeness with the arrow and to cutting his throat.  In all, the interview lasted for over two hours and ended at around 2:00 a.m. on December 31, 2018.

¶12    In an oral ruling, the circuit court denied Seehaver's motion to suppress.  Subsequently, Seehaver pled no contest to an amended charge of second-degree intentional homicide by use of a dangerous weapon, as a repeater.  He now appeals.

## DISCUSSION

¶13    "When reviewing a circuit court's denial of a motion to suppress evidence, we apply a two-step standard.  We uphold the circuit court's findings of fact unless they are clearly erroneous.  We then review de novo the application of the facts to the constitutional principles."  *State v. Lonkoski*, 2013 WI 30, ¶21, 346 Wis. 2d 523, 828 N.W.2d 552.  "Whether a waiver of the rights to silence and to counsel was knowingly, voluntarily and intelligently made is a question of law for our independent review."  *State v. Rejholec*, 2021 WI App 45, ¶16, 398 Wis. 2d 729, 963 N.W.2d 121 (citation omitted).

### I. *Miranda warnings*

¶14    *Miranda* warnings must be provided "whenever the State interrogates a suspect in police custody."  *State v. Harris*, 2017 WI 31, ¶11, 374 Wis. 2d 271, 892 N.W.2d 663.  *Miranda* warnings must warn a suspect that "he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed."  *Miranda*, 384 U.S. at 444.  The State bears the burden of proving by a preponderance of the evidence that a

defendant's statements to law enforcement were constitutionally provided. ***State v. Jiles***, 2003 WI 66, ¶26, 262 Wis. 2d 457, 663 N.W.2d 798.

¶15 The State concedes that Seehaver was in custody for purposes of a ***Miranda*** analysis. The parties disagree, however, whether Seehaver was subject to an unlawful interrogation before the investigators provided him ***Miranda*** warnings.[2]

¶16 Seehaver's interrogation argument relies almost exclusively on a comparison between his situation and the one discussed in ***Missouri v. Seibert***, 542 U.S. 600 (2004).[3] In ***Seibert***, police expressly "questioned" a suspect for "30

---

[2] The State argues that Seehaver conceded the "interrogation" issue by not responding to the State's argument in the circuit court or on appeal. We disagree. Seehaver clearly argued in circuit court—and does so again here—that the investigators were required to provide him with ***Miranda*** warnings at the start of the interview. *See **Miranda v. Arizona***, 384 U.S. 436 (1966). He therefore adequately addresses the interrogation issue, albeit unclearly, as explained next.

[3] Seemingly in support of his approach to the constitutional issue raised, Seehaver states:

> The crux of the disagreement between the State and Seehaver is that the State maintains that the police's interrogation of Seehaver can be divided into two discrete parts, a pre-***Miranda*** non-interrogative period of *preliminary* questioning, and a post-***Miranda*** interrogation. The State, however, cites no authority that an interrogation can be parsed in this manner. Seehaver, on the other hand, maintains that his interrogation must be treated as a single integrated whole, that it cannot be parsed into separate sections with each isolated section being given its own separate ***Miranda*** analysis.

(Footnote omitted.) Seehaver misses the mark regarding the proper constitutional analysis. Contrary to Seehaver's argument, non-interrogative questioning is not transformed into an interrogation simply because it is followed by interrogative questioning. Consistent with ***Miranda*** and subsequent case law, we must first determine whether an interrogation took place. To do so, we consider whether the investigators' questions and actions prior to the ***Miranda*** warnings constituted interrogation.

(continued)

to 40 minutes" without giving her *Miranda* warnings. *Seibert*, 542 U.S. at 604-05. After police obtained a confession from the suspect, she was given a "20-minute coffee and cigarette break." *Id.* at 605. Police then immediately questioned the suspect again, this time after providing her *Miranda* warnings. *Seibert*, 542 U.S. at 605. During the second questioning, the police "confronted [the suspect] with her prewarning statements" and obtained a second confession. *Id.* At a suppression hearing, the officer who questioned the suspect testified that "he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, then repeat the question 'until I get the answer that she's already provided once.'" *Seibert*, 542 U.S. at 605-06.

¶17    The Court referred to this technique as "question-first" and it stated that the technique's "object … is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Seibert*, 542 U.S. at 611. The Court reasoned that "it is likely that if the interrogators employ the technique of withholding [*Miranda*] warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." *Seibert*, 542 U.S. at 613. Reading a suspect *Miranda* warnings midway through an interrogation could, according to the Court, "lead to an entirely reasonable inference that what he [or she] has just said will be used,

---

Notably, Seehaver does not argue that the investigators engaged in "express questioning" or its "functional equivalent." *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Because Seehaver relies almost exclusively on *Missouri v. Seibert*, 542 U.S. 600 (2004), we will not develop an argument on his behalf regarding whether express questioning or its functional equivalent took place. *See State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) ("We cannot serve as both advocate and judge.").

with subsequent silence being of no avail." *Seibert*, 542 U.S. at 613. The Court warned that "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here …, the focus is on facts apart from intent that show the question-first tactic at work." *Id.* at 616 n.6. Ultimately, the *Seibert* Court affirmed a lower court's suppression of the suspect's statements. *Id.* at 617.

¶18 In reaching its conclusion in *Seibert*, the Court distinguished its decision from *Oregon v. Elstad*, 470 U.S. 298 (1985). *Seibert*, 542 U.S. at 614. In *Elstad*, police arrested an eighteen-year-old suspect at his house on a charge related to the burglary of a family home. *Elstad*, 470 U.S. at 300. During the arrest, one officer spoke with the suspect's mother in the kitchen to explain that the officers had a warrant for the suspect's arrest. *Id.* at 300-01. A second officer remained with the suspect in the living room and he asked the suspect "if he was aware why [the officers] were there to talk with him." *Id.* at 301. The second officer then asked the suspect if he knew the name of the burglarized family, to which the suspect said "yes." *Id.* The second officer informed the suspect that he felt the suspect was involved in the burglary, and the suspect stated, "Yes, I was there." *Id.* The suspect was subsequently transported to a police station, where the officers read him his *Miranda* rights—which he waived—interrogated him, and obtained a confession. *Elstad*, 470 U.S. at 301. The Court ultimately concluded that *Miranda* did not require suppression of the suspect's statements. *Elstad*, 470 U.S. at 317-18.

¶19 The *Seibert* Court characterized the *Elstad* decision "as treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally." *Seibert*, 542 U.S. at 615. The Court went on to explain that

11

> [t]he contrast between **Elstad** and this case reveals a series of relevant facts that bear on whether **Miranda** warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 615. Unlike **Elstad**, the questioning of the suspect in **Seibert** "was systematic, exhaustive, and managed with psychological skill." **Seibert**, 542 U.S. at 616. Notably, "[t]he warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment," and the officers "did not advise that [the suspect's] prior statement could not be used." **Id.** The Court concluded that "a reasonable person in the suspect's shoes could not have understood [the **Miranda** warnings] to convey a message that [he or] she retained a choice about continuing to talk." **Seibert**, 542 U.S. at 617.

¶20 The facts in **Seibert**—namely, the use of the question-first tactic—are not present here. The questions posed to Seehaver prior to the **Miranda** warnings included: whether Seehaver would like something to drink; what name he would like to be referred to as; a request to tell the officers "a little bit about" himself; how long he lived in Menomonie; what his address was; and whether Seehaver recalled a previous conversation with Sampson. While Seehaver responded to these questions, the investigators listened to him without interruption for minutes on end. At one point, Seehaver talked for nearly twelve minutes without the investigators interrupting, other than to once say, "Wow." Thus, Seehaver's interview was more in line with the questioning in **Elstad**, where there

was no evidence that the interview "was systematic, exhaustive, and managed with psychological skill."[4] *Seibert*, 542 U.S. at 616.

¶21 While the investigators in this case did refer back to Seehaver's pre-*Miranda* statements about the Aryan Brotherhood and aliens (which, at least to some degree, related to Likeness) during their post-*Miranda* questioning, and while the interview did continue in one "segment" with the same investigators like the interview in *Seibert*, the record is devoid of facts showing that the investigators used an unlawful technique. In other words, the investigators did not use the question-first tactic in order to obtain a confession from Seehaver before reading him *Miranda* warnings in order to later use the confession against him to obtain a second confession post-*Miranda* warnings. Notably, the investigators did not reference Seehaver's inculpatory statement—"I didn't kill John out of—he was fucking miserable"—during the post-*Miranda* questioning. Accordingly, we find no violation of Seehaver's constitutional rights based upon the investigators' pre-*Miranda* questions.

## II. *Miranda waiver*

¶22 Next, Seehaver asserts that he did not knowingly and intelligently waive his *Miranda* rights once the warnings were provided. "For statements made during a custodial interrogation to be admitted, the State has the burden to prove

---

[4] Seehaver also argues that law enforcement had "no reason" to evaluate whether he was "under the influence of a substance before they start[ed] their 'official' interrogation" because "[i]ntoxication has never stopped the police from interrogating anyone." Seehaver does not explain this argument further or support it with authority. *See Pettit*, 171 Wis. 2d at 646. To the contrary, case law suggests that a suspect's intoxication can affect the admissibility of his or her statements where there is proof "that the confessor was irrational, unable to understand the questions or his [or her] responses, otherwise incapable of giving a voluntary response, or reluctant to answer the questions posed by authorities." *See State v. Clappes*, 136 Wis. 2d 222, 241-42, 401 N.W.2d 759 (1987).

by a preponderance of the evidence that the defendant was adequately informed of his or her ***Miranda*** rights and waived them." ***Rejholec***, 398 Wis. 2d 729, ¶19; *see also Miranda*, 384 U.S. at 444. "In order to be valid, a ***Miranda*** waiver must be knowing, voluntary and intelligent." ***Rejholec***, 398 Wis. 2d 729, ¶19 (citation omitted). Aside from his above arguments, Seehaver does not contend that the ***Miranda*** warnings were deficiently provided (in form) or that his waiver was involuntary. We will therefore focus our analysis on whether he knowingly and intelligently waived his rights.

¶23    A ***Miranda*** "waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." ***Rejholec***, 398 Wis. 2d 729, ¶29 (citation omitted). "[A]wareness involves simply being cognizant at all times of 'the State's intention to use [one's] statements to secure a conviction' and of the fact that one can 'stand mute and request a lawyer.'" ***State v. Lee***, 175 Wis. 2d 348, 365, 499 N.W.2d 250 (Ct. App. 1993) (second alteration in original; citation omitted). This analysis is an objective test, meaning "that the validity of any ***Miranda*** waiver must be determined by the court's inspection of the particular circumstances involved, including the education, experience and conduct of the accused as well as the credibility of the police officers' testimony." ***Lee***, 175 Wis. 2d at 364. "[A] suspect's mental condition is a 'significant factor' in this analysis." ***State v. Abbott***, 2020 WI App 25, ¶31, 392 Wis. 2d 232, 944 N.W.2d 8 (citation omitted).

> In the absence of countervailing evidence, once the [S]tate has established a prima facie case of waiver of ***Miranda*** rights and voluntariness of an in-custody statement, the statement should be admitted into evidence.
>
>  ….
>
> "[T]he general rule is that a prima facie case will be established 'when the [S]tate has established that [the]

14

> defendant has been told or has read all the rights and admonitions required in *Miranda*, and the defendant indicates he [or she] understands them and is willing to make a statement.'"

*Lee*, 175 Wis. 2d at 359-60 (citation omitted).

¶24 We agree with the State that it has established a prima facie case for a valid *Miranda* waiver. Following preliminary questions, Pollock paused the interview, read Seehaver undisputedly valid *Miranda* warnings, and Seehaver responded that he understood the warnings, stating, "Oh, yes, I do." Pollock then asked Seehaver if he was willing to continue with the questioning. Despite Seehaver at first stating "[n]o" and stating that he wanted the investigators to "kill" him, he continued to converse, without provocation, with the investigators. Seehaver therefore implicitly waived his *Miranda* rights. *See Abbott*, 392 Wis. 2d 232, ¶31.

¶25 Despite the State's prima facie evidence of a valid waiver, Seehaver contends that his waiver was not knowingly and intelligently made because "there can be no question" that he was "floridly delusional when he was interrogated." Seehaver also notes that he was later found incompetent to stand trial, and only after medication and treatment was he later restored to competency.

¶26 First, we are unpersuaded by Seehaver's reliance on the circuit court's later finding of his incompetence. When assessing a defendant's competency to stand trial, the "court's determination is concerned with the defendant's '*present* mental capacity to understand and assist *at the time of the proceedings*.'" *State v. Smith*, 2016 WI 23, ¶37, 367 Wis. 2d 483, 878 N.W.2d 135 (citation omitted). Conversely, a *Miranda* waiver analysis considers whether, at the time the warnings were read, the suspect was aware of the rights provided in

the ***Miranda*** warnings—that is, whether the suspect was aware that the State could use his or her statements to obtain a conviction and that he or she could remain silent and request a lawyer. *See **Lee***, 175 Wis. 2d at 360.

¶27    Here, the circuit court found Seehaver to be incompetent on March 28, 2019—nearly three months after the interrogation took place. Therefore, the fact that he was found incompetent to stand trial—months after the interrogation—indicates nothing about his competency on the date of his interrogation, and does not rise to the level of "countervailing evidence" that is required to rebut the State's prima facie showing of a valid ***Miranda*** waiver. *See **Lee***, 175 Wis. 2d at 359-61. Additionally, as the State points out, Seehaver did not seek to enter a plea of not guilty by reason of mental disease or defect—which would require Seehaver to have been mentally impaired at the time of the offense, which was the same day as the interrogation—and we therefore do not have before us an evaluation of his mental capacity on the day of the interrogation.

¶28    Second, a defendant's mental condition, while a significant factor in our analysis, is but one factor. Prior to Pollock even reading Seehaver his ***Miranda*** warnings, Seehaver stated that "if I wanted to do what the devil has been telling me to do, I would shut my fucking mouth and … lawyer up. I—and I—ask to get out of here and go back to my cell. I don't think that's the right thing to do though." Later, during the interrogation, Seehaver again brought up the fact that he could have "shut [his] mouth and lawyered up." While some of Seehaver's statements could be characterized as strange, he also made statements indicating his lucidity and his understanding of his right to have an attorney represent him and that he did not need to speak with the investigators.

¶29    Therefore, despite Seehaver's reference to topics such as the Aryan Brotherhood and aliens, his statements following the ***Miranda*** warnings demonstrate that he was aware that the State could use his statements against him at trial and that he could stay quiet and go back to his jail cell and request a lawyer. *See **Lee***, 175 Wis. 2d at 360. These understandings are all that is required for a valid ***Miranda*** waiver.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2021-22).